******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANDRE DAWSON
(AC 40337)

Lavine, Bright and Harper, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of criminal possession of a pistol or revolver and criminal trespass in the third degree, the defendant appealed to this court. Police officers were patrolling a housing complex when they entered a courtyard where they saw six individuals, including the defendant. While two officers conversed with the defendant and three others who were seated at a picnic table near a corner formed by the cement walls of a planter, a third officer, L, stepped onto the wall behind the defendant and immediately saw in plain view a gun lying in the corner by the bushes, about four to five feet away from the defendant. Subsequently, the police used swabs to collect DNA from the gun and the ammunition that L had removed from the gun. The swabs, as well as DNA samples provided by the defendant and the three others were delivered to the state forensics laboratory, where R, a forensic science examiner, conducted DNA analyses of the materials. The quantity of the touch DNA on the swabs was small, and the DNA was partially degraded, but R was able to compare the DNA from the swabs with the samples provided in a scientifically accurate way and to obtain scientifically viable and accurate results. R's analysis eliminated the three other individuals as possible contributors to the DNA profile she developed from the swabs, but the defendant could not be eliminated as a contributor. *Held*:

1. The defendant could not prevail on his claim that there was insufficient evidence to support his conviction of criminal possession of a pistol or revolver because there was insufficient evidence of his knowledge of the gun and no evidence to prove his dominion or control over it: even though the defendant was not in exclusive control of the courtyard where the gun was found, the circumstances established a nexus between the defendant and the gun and permitted the jury reasonably to infer that the defendant knew of the gun's presence, that he was in a position to exercise dominion or control over it, and that he intended to do so, as the gun, which was discovered using a flashlight, was found in plain view in the open, and was uncovered and appeared to have been placed near the bushes just before L discovered it, the jury reasonably could have inferred therefrom that the person who put the gun near the bushes did not abandon it and leave the courtyard but, instead, was one of the six individuals in the courtyard when the police officers arrived, L testified that individuals who have a gun in their possession try to discard or stash the gun in an area close to them when they become aware of a police presence so that they will not be detected with it and, thus, it was reasonable for the jury to infer that the defendant, a convicted felon, quickly put the gun on the wall near the bushes to avoid being found with the gun, which was found four to five feet from the defendant, who was the only person at the picnic table who could not be eliminated as a contributor to the DNA profile found on the gun and ammunition; moreover, contrary to the defendant's claim, the state did not rely on DNA evidence alone to prove that the defendant knew of the gun's presence on the wall near the bushes, and although the defendant claimed that the DNA evidence was insufficient due to the questionable reliability of testing a small sample, the size of the DNA sample went to the weight of the evidence, not its admissibility; furthermore, the defendant could not prevail on his claim that even if the state produced sufficient evidence that he knew of the gun's presence, it failed to adduce any evidence of his intent to exercise dominion or control of the gun, as there was evidence of the defendant's proximity to the gun, which provided a DNA profile from which, among those present, only the defendant could not be excluded, there was circumstantial evidence that the gun recently had been placed on the wall near the bushes, the defendant, a convicted felon, had a reason not to want to be found with the gun on his person, and the jury, therefore, reasonably could have

inferred that he stashed the gun but remained in close proximity to it, so that he could exercise dominion or control over it, and that he intended to do so.

2. The defendant's unpreserved claim that he was deprived of his constitutional right to a fair trial as a result of certain instances of prosecutorial impropriety during closing argument was unavailing:

a. Even though the prosecutor provided the jury with an incomplete and incorrect statement of the law of constructive possession by leaving out the necessary element of intent when she incorrectly told the jury that it could convict the defendant if he knew where the gun was located and had access to it, that error did not deprive the defendant of his right to a fair trial; the trial court's jury instructions, which were nearly identical to our model jury instructions for criminal possession of a gun, corrected the prosecutor's incorrect statement of the law of possession by giving a full and complete instruction on possession, the defendant failed to demonstrate how the model jury instruction that was used in the present case was a source of constitutional error, and despite the fact that the prosecutor's inaccurate reference to the law of constructive possession had the potential to confuse the jury, any perceived impropriety did not deprive the defendant of a fair trial, as the prosecutor's argument was not central to the theory of defense that focused on the DNA evidence, the state's case was convincing, and the court's correct charge on constructive possession, coupled with the repeated admonitions that the jury must follow the law as given to it by the court, adequately cured the prosecutor's error.

b. The defendant could not prevail on his claim that the prosecutor mischaracterized the DNA evidence and R's testimony, and improperly suggested that there was no evidence to support the defense's theory that the defendant's DNA on the gun or ammunition came to be there in some incidental or accidental fashion; although R, who testified as to a number of ways in which the defendant's DNA could have been transferred to the gun and that she did not know how his DNA was deposited on it, described possibilities or hypotheticals, her testimony was not evidence of how, in fact, the defendant's DNA came to be on the gun or the ammunition, and the state, which proved that the defendant's DNA was contained in the DNA profile developed from the swab of the gun and ammunition, and presented circumstantial evidence permitting the jury to find the defendant guilty of criminal possession of a pistol or revolver, was not required to introduce evidence to corroborate that the DNA was placed on the gun or ammunition by direct contact.

Argued November 15, 2018—officially released March 19, 2019

*Procedural History*

Information, in the first case, charging the defendant with the crime of criminal possession of a firearm, and information, in the second case, charging the defendant with the crime of criminal trespass in the third degree, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number twenty, where the cases were consolidated; thereafter, the state filed a substitute information charging the defendant with the crimes of criminal possession of a pistol or revolver and criminal trespass in the third degree; subsequently, the matter was tried to the jury before *Hernandez, J.*; thereafter, the court denied the defendant's motion for a judgment of acquittal as to the count of criminal possession of a pistol or revolver; verdicts and judgments of guilty, from which the defendant appealed in part to this court. *Affirmed*.

*Erica A. Barber*, assigned counsel, with whom, on the brief, was *Allison M. Near*, for the appellant (defendant).

*Nancy L. Walker*, assistant state's attorney, with

whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Suzanne M. Vieux*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Andre Dawson, appeals from the judgment of conviction, rendered after a jury trial, of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1).[1] On appeal, the defendant claims that (1) there was insufficient evidence that he was in possession of a pistol or revolver (gun), and (2) he was deprived of a fair trial by the prosecutor's final argument in which the prosecutor allegedly (a) misstated the law of constructive possession and (b) mischaracterized the DNA evidence presented at trial.[2] We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. At approximately 9:35 p.m. on August 10, 2014, Police Officers Kyle Lipeika, Stephen Cowf, and Michael Pugliese (officers) were patrolling Washington Village, a housing complex in Norwalk. The officers were members of the Street Crimes Task Force within the Special Services Division (task force) of the Norwalk Police Department (department).[3] They had entered Washington Village from Day Street and walked through an alley that led to a courtyard between buildings 104 and 304. Lipeika was shining a flashlight in order for people in the courtyard to see the officers approaching. Lipeika and Cowf were wearing uniforms with yellow letters identifying them as police. When the officers entered the courtyard, they saw benches, a picnic table, a cement retaining wall,[4] bushes, a playground, and six individuals.[5]

The defendant, Kason Sumpter, and Altolane Jackson were seated at the picnic table near a corner formed by the cement walls of a planter. The defendant was seated with his back to the cement wall containing the bushes. See footnote 4 of this opinion. Brian Elmore first walked away from the officers, but turned back and sat at the picnic table.[6] To establish rapport with the individuals sitting at the table, the officers engaged them in conversation. As was their practice, the officers scanned the area for firearms and narcotics that the individuals may have tried to conceal.[7] As Cowf and Pugliese conversed with the individuals at the picnic table, Lipeika stepped onto the wall behind the defendant and immediately saw in plain view a gun lying in the corner by the bushes.

According to Lipeika, the gun looked like it had been placed there just before he discovered it because the gun was resting on top of leaves, was not covered with dirt or debris, except a twig, and appeared to be free of rust and dust. Jackson and Kason Sumpter were seated closest to the gun, two or three feet away from it. The defendant was seated four to five feet away from the gun. None of the officers who testified had seen the defendant touch the gun.

When Lipeika discovered the gun, he drew his weapon and ordered the six individuals in the courtyard to show their hands. Pugliese and Cowf detained the individuals and moved them away from the gun. Lipeika radioed for more officers and guarded the gun until the scene was secured. The additional officers photographed the scene and the gun. Then Lipeika put on a new pair of rubber gloves and seized the loaded gun in accordance with department procedures. He removed the ammunition from the gun, a revolver with a two inch barrel, and took the ammunition and the gun to the police station.

Days later, at Lipeika's request, the defendant, Kason Sumpter, Jackson, and Elmore went to the police station; each of them voluntarily provided a sample of his DNA. None of them claimed that the gun was his. The defendant also provided a written statement in which he stated that he "walked through Washington Village to Water Street, stopped to talk when officers came through and found a handgun in the bushes in the area [where] I was talking."

Jackson, too, provided a written statement and testified at trial that he was in the Washington Village courtyard when the defendant walked through and stopped to talk. He also stated that ten minutes later someone said "police," and everyone looked up. Jackson did not see the defendant with a gun, and he did not see the defendant walk toward the bushes where the gun was found. Jackson confirmed that the gun did not belong to him.

On August 28, 2014, Arthur Weisgerber, a lieutenant in the department, tested the gun for latent fingerprints but did not find any suitable for identification. Thereafter, he used swabs to collect DNA from the gun and the ammunition that Lipeika had removed from the gun. He placed the swabs in an envelope. In addition, Weisgerber fired the gun and determined that it was operable. The swabs and the DNA samples provided by the defendant, Kason Sumpter, Jackson, and Elmore, were delivered to the state forensics laboratory (laboratory), where Melanie Russell, a forensic science examiner, conducted DNA analyses of the materials. Russell provided expert testimony at trial.

The laboratory has procedures to protect DNA samples and evidence from contamination. It also prescribes how laboratory analysis of DNA is to be conducted. The DNA that Weisgerber swabbed from the gun and ammunition is touch DNA because it was deposited on the gun or ammunition when someone touched them directly, through a secondary transfer or through aerosolization, that is, coughing or sneezing. Touch DNA comes from skin cells left behind when a person touches an object. The quantity and quality of touch DNA varies according to the character of the

object's surface, i.e., rough or smooth, and the length of time the DNA has been on the object. DNA degrades with time due to environmental factors, such as heat and moisture. Degradation makes it difficult to amplify the DNA and, in some cases, even to detect DNA.

The quantity of DNA on the swabs was small, and the DNA was partially degraded. Nonetheless, Russell was able to extract a DNA solution of 7.16 picograms per microliter from the swabs. Although she was able to amplify a sample of about seventy picograms of DNA, 1000 picograms is the ideal amount for DNA analysis. A low yield sample will provide a DNA profile but usually not a full profile. Russell was able to generate a partial profile and obtained results at seven out of fifteen loci tested. The profile Russell obtained from the gun and ammunition consisted of a mixture of DNA, signifying the presence of more than one person's DNA. She was able to compare the DNA from the swabs with the samples provided by the defendant, Kason Sumpter, Elmore and Jackson in a scientifically accurate way and to obtain scientifically viable and accurate results. Her analysis eliminated Kason Sumpter, Elmore, and Jackson as possible contributors to the DNA profile she developed from the swabs. The defendant, however, could not be eliminated as a contributor. The expected frequency of individuals who could not be eliminated as a contributor to the DNA profile is approximately one in 1.5 million in the African-American population, one in 3.5 million in the Caucasian population, and one in 930,000 in the Hispanic population.[8] The defendant is African-American.

A warrant was issued for the defendant's arrest on September 25, 2014. He was charged in separate informations with criminal possession of a firearm in violation of General Statutes § 53a-217[9] and criminal trespass in the third degree in violation of General Statutes § 53a-109 (a) (1). The informations were consolidated for trial. Subsequently, the state filed an amended long form information charging the defendant with criminal possession of a pistol or revolver in violation of § 53a-217c and criminal trespass in the third degree in violation of § 53a-109 (a) (1). At the conclusion of the state's case-in-chief, the defendant moved for a judgment of acquittal on the charge of criminal possession of a pistol or revolver. The court denied the motion for a judgment of acquittal. The jury found the defendant guilty of both charges. The court sentenced the defendant to consecutive terms of ten years imprisonment, two years being a mandatory minimum, on the conviction of criminal possession of a pistol or revolver, and three months imprisonment on the conviction of criminal trespass in the third degree, for a total effective sentence of ten years and three months to serve. Thereafter, the defendant appealed.

I

The defendant claims that there was insufficient evidence to convict him of criminal possession of a pistol or revolver because there was insufficient evidence of his knowledge of the gun and no evidence to prove his dominion or control over it.[10] We disagree.

The defendant was charged, in part, with violation of § 53a-217c, which provides in relevant part: "(a) A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver . . . and (1) has been convicted of a felony . . . ."[11] General Statutes § 53a-3 (2) defines "possess" as "to have physical possession or otherwise to exercise dominion or control over tangible property . . . ." Because the gun was not found on the defendant's person, the state prosecuted the subject charge under the theory of constructive possession.

"There are two types of possession, actual possession and constructive possession. . . . Actual possession requires the defendant to have had direct physical contact with the [gun]." (Citation omitted; internal quotation marks omitted.) *State* v. *Johnson*, 137 Conn. App. 733, 740, 49 A.3d 1046 (2012), rev'd in part on other grounds, 316 Conn. 34, 111 A.3d 447, and aff'd, 316 Conn. 45, 111 A.3d 436 (2015). "Where . . . the [gun is] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . Where the defendant is not in exclusive possession of the premises where the [gun is] found, it may not be inferred that [the defendant] knew of the presence of the [gun] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) *State* v. *Winfrey*, 302 Conn. 195, 210–11, 24 A.3d 1218 (2011). "The essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent. In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object." *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986).

"[T]o mitigate the possibility that innocent persons might be prosecuted for . . . possessory offenses . . . it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband." (Internal quotation marks omitted.) *State* v. *Bowens*, 118 Conn. App. 112, 121, 982 A.2d 1089 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010). "[M]ere proximity to a gun is not alone sufficient to establish constructive possession, evidence of some other factor—including connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise—coupled with proximity may suffice."

(Internal quotation marks omitted.) Id., 125.

The standard of review for sufficiency of the evidence claims is well known. "A defendant who asserts an insufficiency of the evidence claim bears an arduous burden." *State* v. *Hopkins*, 62 Conn. App. 665, 669–70, 772 A.2d 657 (2001). "In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Abraham*, 64 Conn. App. 384, 400, 780 A.2d 223, cert. denied, 258 Conn. 917, 782 A.2d 1246 (2001).

"It is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . The jury may draw reasonable inferences based on other inferences drawn from the evidence presented. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable." (Internal quotation marks omitted.) *State* v. *Bradley*, 60 Conn. App. 534, 540, 760 A.2d 520, cert. denied, 255 Conn. 921, 763 A.2d 1042 (2000). "The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 80, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). "[T]his court has held that a jury's factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) *State* v. *Hector M.*, 148 Conn. App. 378, 384, 85 A.3d 1188, cert. denied, 311 Conn. 936, 88 A.3d 550 (2014).

As our Supreme Court has often noted, "proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . Indeed, direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct

. . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Robert S.*, 179 Conn. App. 831, 835–36, 181 A.3d 568, cert. denied, 328 Conn. 933, 183 A.3d 1174 (2018), citing *State* v. *Fagan*, supra, 280 Conn. 79–81.

In the present case, there is no dispute that the defendant did not have the gun on his person at the time Lipeika discovered it in the courtyard of Washington Village on August 10, 2014, and that he was not in exclusive possession of the courtyard where Lipeika found the gun. The state, therefore, was required to establish that the defendant was in constructive possession of the gun. To prove constructive possession under § 53a-217c (a) (1), the state had to present evidence beyond a reasonable doubt that the defendant had knowledge of the gun and intended to exercise dominion or control over it. See *State* v. *Hernandez*, 254 Conn. 659, 669, 759 A.2d 79 (2000); *State* v. *Davis*, 84 Conn. App. 505, 510, 854 A.2d 67, cert. denied, 271 Conn. 922, 859 A.2d 581 (2004). The defendant argues on appeal that although the gun was found near him and his DNA was found on it, his proximity to it and the presence of his DNA on the gun and ammunition are not sufficient evidence to prove that he had knowledge of the gun, knew of its presence or exercised dominion or control over it. In particular, the defendant argues that the presence of his DNA on the gun merely means that at some unknown time and under unknown circumstances his DNA was transferred to the gun, but that is insufficient to support a finding that he knew of the gun's presence.

The state acknowledges that because the defendant was not in exclusive control of the courtyard, the jury could not infer properly from that circumstance that the defendant knew of the gun's presence without incriminating statements or other circumstances to buttress the inference. See *State* v. *Butler*, 296 Conn. 62, 78, 993 A.2d 970 (2010). The state, however, contends that there were four circumstances that established a nexus between the defendant and the gun and permitted the jury reasonably to infer that the defendant knew of the gun's presence, that he was in a position to exercise dominion or control over it, and that he intended to do so. See *State* v. *Hill*, supra, 201 Conn. 516. We agree with the state.

First, the state notes that the gun was found in plain view and appeared to have been placed near the bushes recently. The jury, therefore, reasonably could have inferred that the person who put the gun near the bushes did not abandon it and leave the courtyard but, instead, was one of the six individuals in the courtyard when the officers arrived. In response, the defendant argues that the gun was not in plain view because Lipeika needed a flashlight to see it.[12] The defendant's argument

lacks merit. The police were patrolling the courtyard pursuant to the department's agreement with the housing authority. The officers needed artificial light both to be seen as they approached the courtyard and to see what was in the courtyard. The gun was lying on a wall in a public space, and it was dark. The gun was in the open and uncovered, and, therefore, it was in plain view. It clearly would have been visible in daylight. Under the circumstances, there is no difference between Lipeika's using a flashlight and turning on a light in a dark room. Furthermore, the state's argument is not that the location of the gun is evidence that the defendant saw it there. Instead, the state's argument is that the location of the uncovered gun near the bushes close to the defendant supports the inference that the defendant had placed the gun there. Thus, the lighting conditions at the time were immaterial.

Second, the state points out that Lipeika was shining his flashlight when the officers walked through the alley into the courtyard. In his statement to the police, Jackson stated that someone saw the light and called out "police," causing individuals in the courtyard to look up. According to Lipeika, when individuals who have a gun in their possession become aware of a police presence, they try to "discard . . . or stash" the gun so that they will not be detected with it. The state, therefore, argues that it was reasonable for the jury to infer that the defendant quickly put the gun on the wall near the bushes to avoid being found with it. The jury reasonably could have inferred from the evidence that the defendant, whom it knew to be a convicted felon, was motivated to "stash" the gun because he is not entitled to possess a gun.

Third, the state cites Lipeika's testimony that, when individuals with a gun seek to "discard . . . or stash" it, they put the gun in a place close enough to be "accessible" to them. In this instance, the gun was four to five feet from the defendant, who was sitting at a picnic table next to the wall and bushes.

Fourth, the defendant was the only person at the picnic table who could not be eliminated as a contributor to the DNA profile found on the gun and ammunition. The chance that a random individual, someone other than the defendant, could have contributed to the DNA was one in 1.5 million in the African-American population. On the basis of these four circumstances, the state argues that the jury reasonably could have inferred that the defendant knew of the gun's presence and could have exercised dominion or control over it, and intended to do so. Although none of the factors alone is direct evidence of the defendant's knowledge of the gun's presence or his intent to possess it, the cumulative force of the circumstantial evidence was sufficient for the jury reasonably to infer that the defendant knew of the gun and was in constructive posses-

sion of it. "Where a group of facts [is] relied upon for proof of an element of the crime it is [the] cumulative impact [of those facts] that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard." (Internal quotation marks omitted.) *State* v. *McDonough*, 205 Conn. 352, 355, 533 A.2d 857 (1987), cert. denied, 485 U.S. 906, 108 S. Ct. 1079, 99 L. Ed. 2d 238 (1988). Evidence of the defendant's DNA on the gun and ammunition, plus his proximity to the gun, leads to a reasonable inference that the defendant once had the gun on his person and intended to do so again when the police left the courtyard.

The defendant argues, citing *State* v. *Payne*, 186 Conn. 179, 440 A.2d 280 (1982), that the state cannot rely on the DNA evidence alone to prove that he knew of the gun's presence on the wall near the bushes. He compares the presence of DNA on the gun to fingerprints found on a vehicle in *Payne*. "[A] conviction may not stand on fingerprint evidence alone unless the prints were found under such circumstances that they could have only been impressed at the time the crime was perpetrated." Id., 182. In *Payne*, the defendant's fingerprints were found on the driver's door of a motor vehicle in which the victim had been restrained. Id., 181. The victim was unable to identify the defendant in a photographic array or at trial. Id. Our Supreme Court reversed the defendant's conviction because "[t]he evidence in the present case does not reasonably exclude the hypothesis that the defendant's fingerprints were placed on the car at a time other than during the perpetration of the crime." Id., 184; see also *State* v. *Mayell*, 163 Conn. 419, 426, 311 A.2d 60 (1972) (where defendant was regularly employed to drive vehicle and rightfully in it six hours before crime defendant's fingerprints on rearview mirror of abandoned vehicle were of no moment unless circumstances were such that fingerprints only could have been impressed at time of crime).

The facts of the present case, however, are distinguishable from both *Payne* and *Mayell*. Here, the defendant not only was at the scene at the time the gun was found, but he also was in close proximity to it. Others were in close proximity to the gun too, but the defendant was the only one of them who was a contributor to the DNA obtained from the surface of the gun or the ammunition, or both. Moreover, the defendant had at least two reasons to "stash" the gun. The defendant stipulated to the fact that he was a convicted felon. We discern that the jury reasonably could have inferred that because the defendant was trespassing[13] and, more importantly, because he was a convicted felon, he had "stashed" the gun to avoid being found with the gun on his person.

The defendant also argues that the DNA evidence

is insufficient due to "the questionable reliability of a sample containing only 70 picograms of DNA, when the ideal amount is 1000 picograms of DNA." The defendant did not object to the admission of the DNA evidence at trial, but cites Russell's testimony regarding problems that are inherent in testing small samples of DNA. Despite the small sampling, however, Russell testified that she was able to analyze the DNA from the gun, and that she obtained scientifically viable and accurate results that revealed a high likelihood that the defendant was a contributor to the sample. Her findings were reviewed by a forensic science examiner in the laboratory and no problems were identified. Defense counsel vigorously cross-examined Russell. Although the burden was on the state to prove its case, the defendant presented no evidence to contradict Russell's testimony regarding the accuracy of her analysis.[14]

The defendant's claim is not that Russell's testimony regarding the results of her DNA analysis was improperly admitted. The evidence, therefore, properly was before the jury to be considered along with the other evidence. The size of the sample went to the weight of the evidence, not its admissibility. "It is axiomatic that it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. . . . It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness . . . and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Osbourne*, 138 Conn. App. 518, 533–34, 53 A.3d 284, cert. denied, 307 Conn. 937, 56 A.3d 716 (2012). The essence of the defendant's argument is that this court should override the inferences drawn by the jury. This we may not, and will not, do. See *State* v. *Davis*, 160 Conn. App. 251, 265–66, 124 A.3d 966 (court on appeal does not sit as seventh juror), cert. denied, 320 Conn. 901, 127 A.3d 185 (2015).

The defendant also claims that even if the state produced sufficient evidence that he knew of the gun's presence, it failed to adduce any evidence of his intent to exercise dominion or control of the gun. "The phrase 'to exercise dominion or control' as commonly used contemplates a continuing relationship between the controlling entity and the object being controlled. Webster's Third New International Dictionary defines the noun 'control' as the 'power or authority to guide or manage.' The essence of exercising control is not the manifestation of an act of control but instead *it is the act of being in a position of control coupled with the requisite mental intent.* In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object." (Emphasis added.) *State* v. *Hill*, supra, 201 Conn. 516.

The defendant relies on the federal case of *United States* v. *Beverly*, 750 F.2d 34 (6th Cir. 1984), to support his claim of insufficient evidence of control. Although *Beverly* also concerned constructive possession of a firearm by a convicted felon, the facts of that case are distinguishable. In the present case, a police officer found the gun in plain sight in a public space in close proximity to the defendant. In *Beverly*, a police officer executed a search warrant at the apartment of a third party. Id., 35. When the officer entered the apartment, he found two men in the kitchen, one of whom was Herbert Collins Beverly, the defendant in that case. Id. The officer instructed the men to place their hands on the wall while he patted them down. Id. As he was conducting the pat down, the officer noticed a waste basket between the two men, and that it contained two guns. Id. The guns later were examined in the state police crime laboratory, where one identifiable, latent fingerprint was discovered on one of the guns. Id. The fingerprint belonged to Beverly. Id. He was charged with violation of 18 U.S.C. § 922 (h) (1) (1982), which prohibits "the receipt by a convicted felon of a weapon that has been shipped in interstate commerce." Id. At the close of the government's case, Beverly moved for a judgment of acquittal, arguing that the evidence demonstrated that he must have touched the gun at some point, but that it did not establish that he had received the gun within the meaning of the statute. Id. The trial court denied the motion. Id.

On appeal, the United States Court of Appeals for the Sixth Circuit reversed the judgment of conviction. Id. At trial, the government had relied on the testimony of the officer who found the gun and the fingerprint expert. Id., 36. It argued that before the search warrant was executed, Beverly had "received the gun within the meaning of [§] 922 because he exercise[d] control over" it. (Emphasis omitted; internal quotation marks omitted.) Id. The government argued that it, therefore, was entitled to prove Beverly received the gun by inference of his constructive possession. Id. The Court of Appeals disagreed, concluding that the evidence did not prove that Beverly was in constructive possession of the gun because the government had not proven that (1) Beverly had indirect control of the kitchen, waste basket, or gun; (2) Beverly was in direct control of any of them; and (3) he was in constructive possession of the gun. Id., 38. The evidence established only that Beverly was one of two men standing on either side of a waste basket in the kitchen, that the waste basket contained two guns, and that, at some time, he had touched one of the guns. Id. The Court of Appeals, therefore, reversed Beverly's conviction. Id. "Presence alone near a gun . . . does not show the requisite knowledge, power, or intention to exercise control over the gun to prove constructive possession." (Emphasis omitted; internal quotation marks omitted.) *United*

*States* v. *Arnold*, 486 F.3d 177, 183 (6th Cir. 2007), cert. denied, 552 U.S. 1103, 128 S. Ct. 871, 169 L. Ed. 2d 736 (2008).

More than twenty years later, the United States Court of Appeals for the Sixth Circuit, sitting en banc, limited the scope of *Beverly*. See id., 183–84. "As an en banc court, we have subsequently distinguished *Beverly* as a proximity-only case without any evidence connect[ing] the gun to the defendant. [Id., 184]. We filled the evidentiary gap in *Arnold* with statements by the victim connecting the gun to the defendant. [Id., 184–85]." (Internal quotation marks omitted.) *United States* v. *Vichitvongsa*, 819 F.3d 260, 276 (6th Cir.), cert. denied, U.S. , 137 S. Ct. 79, 196 L. Ed. 2d 70 (2016).[15]

"While the Government is not required to prove exclusive possession, constructive possession may not be shown merely by introducing evidence of proximity." *United States* v. *Lynch*, 459 Fed. Appx. 147, 151 (3d Cir. 2012). In *Lynch*, the defendant was a convicted felon on parole who was not permitted to possess a firearm. Id., 148. The defendant's parole officer became aware that the defendant had violated the terms of his parole. Id., 148–49. During a permissible warrantless search of the defendant's home; id., 149–50; police found a pistol in the top drawer of a dresser in his bedroom, concealed beneath the defendant's clothing. Id., 149. "A DNA test conducted on a swab from the handle of the firearm revealed a mixture of profiles from which [the defendant's] profile could not be excluded." Id. At trial, the defendant stipulated that he had been convicted of a felony. Id., 150. A jury found the defendant guilty of felony possession of a firearm. Id., 148. On appeal, the defendant argued that there was insufficient evidence that he knowingly possessed the firearm. Id., 151. In support of his position, he cited *Beverly*. The United States Court of Appeals for the Third Circuit distinguished *Beverly* in that the gun was found in a dresser drawer in the defendant's home, not the kitchen of a third person. Id. The court stated that it was not bound to follow *Beverly*, and that although *Beverly* might mitigate the importance of the DNA evidence, there was other evidence tending to show the defendant's constructive possession of the gun. Id.

In the present case, there is evidence of the defendant's proximity to the gun, which provided a DNA profile from which, among those present, only the defendant could not be excluded. There is circumstantial evidence that the gun recently had been placed on the wall near the bushes. The defendant, a convicted felon, had a reason not to want to be found with the gun on his person. The jury, therefore, reasonably could have inferred that he "stashed" the gun but remained in close proximity to it, so that he could exercise control over it, and that he intended to do so.

We acknowledge that the facts of this case presented

some subtle issues for the jury and that the case against the defendant is grounded in circumstantial evidence. The jury, however, was fully entitled to rely on the circumstantial evidence in reaching its verdict. "[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [w]here a group of facts [is] relied upon for proof of an element of the crime it is [its] *cumulative impact* that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard. . . .

"Furthermore, [i]t is immaterial to the probative force of the evidence that it consists, in whole or in part, of circumstantial rather than direct evidence." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 65–66, 43 A.3d 629 (2012). In fact, "circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." (Internal quotation marks omitted.) *State* v. *Sienkiewicz*, 162 Conn. App. 407, 410, 131 A.3d 1222, cert. denied, 320 Conn. 924, 134 A.3d 621 (2016). "If evidence, whether direct or circumstantial, should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." (Internal quotation marks omitted.) *State* v. *Jackson*, 257 Conn. 198, 206, 777 A.2d 591 (2001). "[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . ." (Internal quotation marks omitted.) *State* v. *Brown*, 299 Conn. 640, 647, 11 A.3d 663 (2011).

Although the defendant claims that there was insufficient evidence to convict him of constructive possession of the gun, this is not a case in which the state failed to present evidence regarding an element of the crime. This is a case in which the defendant is looking for a different interpretation of the evidence. This court has stated many times that it does "not sit as the seventh juror when [it] review[s] the sufficiency of the evidence . . . rather, [it] must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict of guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Glasper*, 81 Conn. App. 367, 372, 840 A.2d 48, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004). In the pre-

sent case, the state presented evidence of the defendant's proximity to the gun, which provided a DNA profile from which the defendant could not be excluded. There is circumstantial evidence that the gun recently had been placed on the wall near the bushes. The defendant, a convicted felon, had a reason not to want to be found with the gun on his person, and, therefore, the jury reasonably could have inferred that he had "stashed" it and remained in close proximity to it, so that he could exercise dominion or control over it, if he so intended.

On the basis of our review of the record, we conclude that there was sufficient circumstantial evidence by which the jury reasonably could have inferred that the defendant was in possession of the gun when he entered the courtyard, that he put it near the bushes when the police arrived so that it would not be found on his person, and that he intended to retrieve the gun when the police left. Accordingly, the evidence was sufficient to support the defendant's conviction of criminal possession of a pistol or revolver, and the court, therefore, properly denied the defendant's motion for a judgment of acquittal.

## II

The defendant also claims that he was deprived of a fair trial because, during her final argument, the prosecutor (1) misstated the law of constructive possession and (2) mischaracterized the DNA evidence. We disagree that the defendant was denied his constitutional right to a fair trial.

The defendant did not object to the prosecutor's closing argument and did not request a curative instruction from the court. We, therefore, review the law applicable to unpreserved claims of prosecutorial impropriety.

When a defendant has not preserved his claims of prosecutorial impropriety, "it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)] and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. . . . Our Supreme Court has articulated that following a determination that prosecutorial [impropriety] has occurred, regardless of whether it was objected to, an appellate court must apply the [*State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)] factors to the entire trial. . . . [W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the *burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process*. . . . In analyzing whether the prosecutor's comments deprived the defendant of a fair trial, we generally

determine, first, whether the [prosecutor] committed any impropriety and, second, whether the impropriety or improprieties deprived the defendant of a fair trial. . . .

"When reviewing the propriety of a prosecutor's statements, we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial. . . . [Impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] [was harmful and thus] caused or contributed to a due process violation is a separate and distinct question . . . .

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . [A]s the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Ruiz-Pacheco*, 185 Conn. App. 1, 38–40, 196 A.3d 805, cert. granted on other grounds, 330 Conn. 938, 195 A.3d 385 (2018).

An appellate court's "determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [supra, 204 Conn. 540], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 561, 34 A.3d 370 (2012).

"[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defen-

dant of his constitutional right to a fair trial, *the burden is on the defendant to show . . . that the remarks were improper . . . .*" (Emphasis added.) Id., 562–63. "This allocation of the burden of proof is appropriate because, when a defendant raises a general due process claim, there can be no constitutional violation in the absence of harm to the defendant caused by denial of his right to a fair trial." Id., 563–64. The ultimate question, therefore, is "whether the defendant has proven that the improprieties, cumulatively, so infected the trial with unfairness as to make the conviction[s] a denial of due process." (Internal quotation marks omitted.) Id., 567.

"[T]he defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 612, 65 A.3d 503 (2013).

"To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 37, 975 A.2d 660 (2009).

We now turn to the defendant's prosecutorial impropriety claims.

A

The defendant claims that the prosecutor misstated the law of constructive possession by failing to state that the defendant had to intend to exercise dominion or control over the gun. As a consequence, the defendant argues that the prosecutor invited the jury to disregard the dominion or control element of possession. Although the prosecutor's argument did contain an incomplete and, therefore, incorrect statement of the law of constructive possession, we conclude that the

error did not deprive the defendant of his constitutional right to a fair trial.

To provide a context for the defendant's claims, we have reviewed the entire record, which discloses the following procedural history that is relevant to the defendant's claim that the prosecutor misstated the law. Before the presentation of evidence, the court instructed the jury that "you should understand that the arguments of the attorneys, including the closing arguments and any arguments made during the trial to the court in connection with questions of law, are not evidence. . . . Closing arguments are intended to assist you, the jury, in understanding the evidence and the contentions of the parties in this case. . . . [A]t the conclusion of the final arguments of the parties, *I will instruct you as to the principles of law which you are to apply in your deliberations when you retire to consider your verdicts.*"[16] (Emphasis added.) Again, in its final charge to the jury, after thanking the jury for its service, the court gave the customary charge stating that "it is exclusively the function of the court to state the rules of law that govern the case. It is your obligation to accept the law as I state it. You must follow all of my instructions and not single out some and ignore others. They are all equally important."

The record also discloses that the court held two on-the-record charge conferences. The court gave counsel a copy of a draft of its charge and time to review it. The court and counsel subsequently went through the draft page by page, and counsel made several suggestions, none of which concerned constructive possession. As a result of the charge conference, the court revised portions of its draft charge, presented counsel with its revised charge and provided an opportunity for counsel to review the revisions. At a second on-the-record charge conference, the court and counsel went through the revised charge page by page. Defense counsel orally agreed with the court's revised charge.

"A review of the statements made by the prosecutor, in the context of the entire closing argument, is necessary to address the defendant's challenges." *State* v. *Otto*, supra, 305 Conn. 77. The record contains the arguments of the prosecutor and defense counsel, and the court's instructions, which we have reviewed and hereafter summarize.

In the first portion of her argument, the prosecutor first thanked the jury for its service and then stated that the court will "*remind you as to the elements of the crimes that make up the charges.*" (Emphasis added.) The prosecutor then addressed the elements of the crime of criminal trespass in the third degree and the evidence related to that charge.

Thereafter, she stated, in part: "For you to find the defendant guilty of criminal possession of a pistol or

revolver, the state must prove the following elements beyond a reasonable doubt. The first element is that the defendant possessed a pistol or revolver. *The judge will define possession as having control over an object.* That is, knowing where it is and being able to access it. Again, possession in this case means knowing where it is and being able to access it."[17] (Emphasis added.)

The prosecutor continued: "You've heard that the gun recovered from the scene was found only four to five feet away from [the defendant]. It was lying on top of the leaves, in good condition, as if it had been placed there very recently. No dirt or leaves or other debris were covering it. It was easily in [the defendant's] reach. He was about four to five feet away from it when the police arrived. The state submits that it would have been a matter of seconds for him to stand up, or lean over, and drop the gun, or even pick it up again from where it was lying."

Later in the first portion of her argument, the prosecutor stated: "Here's the thing, *you'll hear the judge instruct you on the law of possession.* And through that you will learn that if [the defendant] walked up to the gun and saw it there and was aware that it was there, he's still in violation of the law. Because as long as he's aware it's there and aware it's a gun, and could grab it off the ground, that's possession. If he walked up to it and said 'oh, no, a gun,' and ran away, i.e., if he immediately removes himself from the situation, that's different. Or if he saw it and immediately dialed 911 or alerted the authorities, that's different, too. But if he sees the gun and remains at the picnic table anyway, four to five feet away from it, not locked up or anything like that, in an area where he could easily get to it, that's constructive possession. It's that simple." (Emphasis added.)

Immediately thereafter, the prosecutor argued: "So for you to find him not guilty, you would have to believe that despite his close proximity to the gun, despite the fact that he's trespassing in the exact location the gun is found, and despite the fact that his DNA, and not the DNA of any other person around the picnic table is on it, he didn't even know it was there. Ask yourselves, based on common sense, is it reasonable and logical to believe that?" The prosecutor also argued that the jury reasonably could infer that the gun belonged to the defendant.

In his closing argument, which immediately followed, defense counsel addressed the evidence, particularly what he considered to be the weakness in the state's case. He contended that the DNA evidence was not enough to incriminate the defendant because the profile was small, the DNA sample was touch DNA, and the sample had been degraded. The theory of defense was that the DNA evidence was problematic and insufficient to prove that the defendant was guilty of felony posses-

sion of the gun. Defense counsel argued, in part, that the state had "to prove, beyond a reasonable doubt, the [the defendant] knew, or had knowledge of, that he was in possession of [the gun], that he knew where it was and that he had access to it." See footnote 17 of this opinion. He continued that the jury could not "infer or assume that [the defendant] knew that a weapon was there, unless there are other incriminating statements or circumstances tending to support such an inference. We argue that no such statements or circumstances exist. . . . You need context, you need corroboration, and you don't have it. You don't have eye witnesses. You don't have fingerprints. You don't have enough."

In the rebuttal portion of her argument, the prosecutor first stated: "I just want to touch on a few things that the defense touched on. I want to start with something. *The judge will instruct you* . . . and I just want to make sure it's clear, that you will come to a separate verdict on each charge. *So, the state has to prove every element of each individual charge.*" (Emphasis added.) She extensively addressed the DNA evidence, which the defendant contended was problematic and insufficient to prove that the gun was his. She argued that the presence of the defendant's DNA on the gun or ammunition and his proximity to the gun was enough to prove his knowledge of it. The prosecutor concluded: "For you to accept the defense's theory, you have to accept the idea that [the defendant] is the unluckiest man alive. That this set of coincidences has come out of nowhere and each and every one of them has coincidentally occurred on the same evening. The convergence of him trespassing, at a time when unluckily a gun was nearby, within four to five feet of him, only his DNA, and no one else's at the scene, gets on to it, at a time when he happens to be trespassing and happens to be prohibited from possession of such a gun."

Immediately upon conclusion of the prosecutor's rebuttal argument, the court began its charge to the jury, stating: "*It is now my duty to instruct you as to the law that you are to apply to the facts in this case. . . .* The charges [are] to be considered as a whole, and individual instructions are not [to] be considered [in] artificial isolation from the overall charge. . . . It is exclusively the function of the court to state the rules of law that govern the case. *It is your obligation to accept the law as I state it.* You must follow all of my instructions and not single out some and ignore others. They are all equally important." (Emphasis added.)

The court gave general instructions applicable in any trial and then addressed the law related to the crimes with which the defendant was charged.[18] The court's instruction included definitions of knowledge and *intent.* The court stated, in part: "A person *acts knowingly* with respect to conduct or to a circumstance described by a statute defining an offense when he is

aware that his conduct is of such nature or that such circumstance exists." (Emphasis added.) It also stated that "[*i*]*ntent* relates to the condition of the mind of the person who commits the act, his or her purpose in doing it. Here, the state is required to prove that the defendant intentionally, and not inadvertently or accidentally, engaged in his actions. In other words, the state must prove that the defendant's actions were intentional, voluntary and knowing, rather than unintentional, involuntary and unknowing." (Emphasis added.)

The court continued: "A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver and has been convicted of a felony. For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. . . . The first element is that the defendant possessed a pistol or revolver. . . . Possession means either having the object on one's person or otherwise having control over the object. That is, knowing where it is and being able to access it. Possession also requires that the defendant knew he was in possession of the firearm. That is, that he was aware that he was in possession of it and was aware of its nature.

"The state must prove, beyond a reasonable doubt, that the defendant knew that he was in possession of the pistol or revolver. Possession does not mean that one must have the illegal object upon one's person. Rather, a person who, although not in actual possession, knowingly has the power and *the intention*, at a given time, to exercise control over a thing is deemed to be in constructive possession of that item. As long as the object is or was in a place where the defendant could, if he wishes, go and get it, it is in his possession."[19] (Emphasis added.) Neither the prosecutor nor defense counsel took an exception to the charge. See footnote 17 of this opinion.

On appeal, the defendant claims that the prosecutor's argument concerning possession "completely disregards the dominion [or] control element of possession and was a direct invitation to the jury to disregard an element of constructive possession that the state was required to prove." He argues that the prosecutor improperly equated mere access with possession and that her argument does not conform to the definition of possession found in *State* v. *Hill*, supra, 201 Conn. 516, to wit, "[t]o possess, according to § 53a-3 (2), is to have actual physical possession or otherwise to exercise dominion or control . . . ." (Internal quotation marks omitted.)

The state acknowledges that the prosecutor did not state explicitly that the defendant must have, not only the power, but also the intention to exercise dominion or control over the gun. It contends, however, that the defendant has not cited any authority that the prosecu-

tor needs to discuss all aspects of the relevant law in summation. The state argues that it is the court's duty "to give jury instructions that are accurate in law, adapted to the issues and adequate to guide the jury in reaching a correct verdict . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Bellamy*, 323 Conn. 400, 429, 147 A.3d 655 (2016). Although we agree that the court is responsible for instructing the jury on the law, that fact does not give the prosecutor license to misstate the law to the jury. During closing argument, the prosecutor three times incorrectly told the jury that it could convict the defendant if he knew where the gun was located and had access to it. According to the prosecutor, "[i]t's that simple." Of course, it is not that simple. The prosecutor's statement left out the necessary element of intent. See *State* v. *Hill*, supra, 201 Conn. 512–17. Consequently, the prosecutor's statement of the law was not just incomplete, it was inaccurate.

Nevertheless, the jury was informed numerous times, including by the prosecutor, that it was the court's responsibility to instruct the jury as to the law. In particular, at the beginning of trial and when it commenced its charge, the court informed the jury that it was its duty to instruct the jury on the law and that the jury was bound to follow the law as given by the court. See *State* v. *Gordon*, 104 Conn. App. 69, 83–84, 931 A.2d 939 (court reminded jury prior to trial and following final argument that court, not counsel, was sole source of applicable law), cert. denied, 284 Conn. 937, 937 A.2d 695 (2007).

"In the absence of a showing that the jury failed or declined to follow the court's [general] instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Singleton*, 95 Conn. App. 492, 505, 897 A.2d 636, cert. denied, 279 Conn. 904, 901 A.2d 1228 (2006).

In his reply brief, the defendant takes exception to the state's position that the court's instructions cured the prosecutor's incorrect statement of the law of possession by giving a full and complete instruction on possession. The state represented that the court's instruction was "nearly identical to the model jury instructions for possession and criminal possession" of a gun.[20] The defendant recognizes that the court's charge conformed to the model jury instructions on the elements of possession, but he argues, citing *State* v. *Reyes*, 325 Conn. 815, 821–22 n.3, 160 A.3d 323 (2017),[21] that the model jury instructions are not indicative of their correctness, and, citing *State* v. *Bellamy*, supra, 323 Conn. 500 (*Palmer, J.*, concurring),[22] that the model instructions have been the source of constitutional error. Despite this argument, the defendant has not demonstrated how the model jury instruction used in the present case is a source of constitutional error, as

the model charge for constructive possession, which is explicitly referenced in the model charge for criminal possession of a pistol or revolver, requires that the state prove knowledge of the gun's presence and an intent to possess it.[23] Moreover, defense counsel had the opportunity to review the court's charge prior to an initial on-the-record charge conference, participated in that charge conference, and offered suggestions. None of the suggestions offered related to the charge on constructive possession. The court made several changes to its charge pursuant to the suggestions of counsel, distributed its revised charge to counsel and held a second on-the-record charge conference. At the conclusion of the second charge conference, defense counsel agreed to the revised charge.[24]

In any event, the court specifically instructed the jury that "a person who, although not in actual possession, knowingly has the power and the intention, at a given time, to exercise control over a thing is deemed to be in constructive possession of that item." "The jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Fields*, 265 Conn. 184, 207, 827 A.2d 690 (2003). "[P]rosecutorial [impropriety] claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address *gross* prosecutorial improprieties . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 576, 849 A.2d 626 (2004). In this case, the court's charge corrected the prosecutor's misstatement of the law of constructive possession.

"[T]he prosecutor's choice of words, at best, was inartful, but . . . when viewed in the context of his entire closing argument . . . even if . . . improper, that impropriety did not deprive the defendant of a fair trial." (Citation omitted.) *State* v. *Nicholson*, 155 Conn. App. 499, 516, 109 A.3d 1010, cert. denied, 316 Conn. 913, 111 A.3d 884 (2015). Although the prosecutor's inaccurate reference to the law of constructive possession had the potential to confuse the jury, applying the *Williams* factors, we conclude that any perceived impropriety did not deprive the defendant of a fair trial. But we take this opportunity to remind prosecutors that during the course of argument, they must take care to accurately discuss the elements of the crimes charged. See *State* v. *Gonzalez*, 188 Conn. App. 304, 339, A.3d (2019) (prosecutor summarized law on home invasion). In examining the *Williams* factors, we find that the prosecutor's argument, although not invited by defense counsel, was not central to the theory of defense that focused on the DNA evidence. Furthermore, the state's case was convincing in that the defendant could not be excluded as a contributor to the DNA mixture obtained from the gun or ammunition. Most importantly, the court's correct charge on constructive possession coupled with the repeated admonitions that

the jury must follow the law as given to it by the court, adequately cured the prosecutor's error.

For the foregoing reasons, we conclude that the prosecutor's statement regarding the law of constructive possession fell well short of misleading the jury with respect to constructive possession and did not deprive the defendant of a fair trial.

B

The defendant also claims that the prosecutor's mischaracterization of the DNA evidence deprived him of a fair trial. We do not agree.

The defendant claims that the state mischaracterized the DNA evidence and improperly suggested that there was no evidence to support the defense's theory that although his DNA may have been on the gun or ammunition, it came to be there in some incidental or accidental fashion. The defendant contends that Russell testified as to the various ways in which DNA can be transferred, and that she could not conclude how the defendant's DNA came to be on the gun and that, therefore, the following portion of the prosecutor's final argument was improper: "You've heard no evidence that [the defendant], for instance, sneezed on the gun. And you can't assume that happened because it's not in evidence. . . . Secondary transfer would require someone to touch [the defendant], or an object, with his DNA on it, and then to touch the gun. But there's no evidence that ever occurred. No evidence for you to consider with regard to that. . . . So, there is no evidence before you that Officer Lipeika, or anyone else for that matter, touched some object that [the defendant] touched and then touched the gun soon thereafter. You haven't heard any evidence to that effect. . . . Again, I would reiterate, you haven't heard any evidence of a transfer DNA. You haven't heard evidence of someone spitting on the gun. And if [the defendant] had spit on the gun, he would have spat around . . . Jackson from four to five feet away. Does that seem likely? The same thing with a sneeze. He would have sneezed around . . . Jackson from four to five feet away. That's not likely."

Defense counsel did not object to the prosecutor's argument. As stated previously, a defendant's failure to object is not fatal to his claim, but this court has stated that we continue "to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time. . . . This is particularly true if, as in the present case, a defendant claims prosecutorial impropriety stemming from a prosecutor's discussion of DNA evidence. Such discussions require precise and nuanced distinctions in nomenclature that easily may be misconveyed or misunderstood, especially in light of the zealous advocacy that is part

and parcel of a closing argument. If a prosecutor's arguments do not portray accurately the DNA evidence as it was presented to the jury or stray too far from reasonable inferences that may be drawn from such evidence, a contemporaneous objection by defense counsel would permit any misstatements, whether inadvertent or intentional, to be remedied immediately." (Citation omitted; internal quotation marks omitted.) *State* v. *Brett B.*, 186 Conn. App. 563, 572,    A.3d    (2018), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019).[25] "[If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Internal quotation marks omitted.) *State* v. *Grant*, 154 Conn. App. 293, 319, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015).

On appeal, the defendant argues that the state offered Russell's testimony to aid the jury in its understanding of the DNA evidence. On cross-examination, defense counsel explored the problematic issues with the DNA profile that were critical to the defendant's theory of the case, i.e., that his DNA was deposited on the gun by secondary transfer or aerosolization. The defendant argues that the prosecutor's final argument that there was no evidence of a secondary transfer or aerosolization for the jury to consider mischaracterized Russell's testimony. We disagree with the defendant.

Russell testified as to a number of ways in which the defendant's DNA could have been transferred to the gun and that she did not know how his DNA was deposited on it. Russell's testimony described possibilities or hypotheticals, but such testimony is not evidence of how, in fact, the defendant's DNA came to be on the gun or the ammunition. Russell, however, testified that the most common way for touch DNA to occur is through direct contact. The prosecutor's argument simply was that there was *no evidence* to support the defendant's theory that the defendant's DNA was deposited on the gun by a secondary transfer or aerosolization. The court instructed the jury that its verdicts had to be based on evidence that it heard. "While the jury may not speculate to reach a conclusion of guilt, [it] may draw reasonable, logical inferences from the facts proven to reach a verdict." (Internal quotation marks omitted.) *State* v. *Stovall*, 142 Conn. App. 562, 567–68, 64 A.3d 819 (2013), rev'd in part on other grounds, 316 Conn. 514, 115 A.3d 1071 (2015).

The defendant also argues on appeal that the state never introduced evidence to corroborate that the DNA was placed on the gun or ammunition by direct contact. It was not required to do so.[26] The state proved that the defendant's DNA was contained in the DNA profile developed from the swab of the gun and ammunition. That fact was in evidence. The state also presented

circumstantial evidence permitting the jury to find the defendant guilty of criminal possession of a pistol or revolver. Pursuant to Russell's testimony, the jury reasonably could have found that it was more likely that the defendant's DNA on the gun and ammunition came from his direct contact with them than from either secondary transfer or aerosolization.

For the foregoing reasons, we conclude that, although the prosecutor misstated the law of constructive possession, the defendant has failed to carry his burden to demonstrate that he was denied due process. We also conclude that the prosecutor did not mischaracterize the DNA evidence. The defendant, therefore, has failed to demonstrate that he was deprived of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Although § 53a-217c (a) (1) was the subject of technical amendments in 2015; see Public Acts, Spec. Sess., June, 2015, No. 15-2, § 7; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] The defendant was also convicted under a separate docket number of criminal trespass in the third degree in violation of General Statutes § 53a-109 (a) (1). He has not challenged that judgment of conviction on appeal.

[3] The task force's objective was to deter street level crime by providing "high visibility police patrol in high crime areas throughout" the city of Norwalk. The department had an agreement with the Norwalk Housing Authority to deter trespassing in housing complexes. The task force undertook foot patrols in housing complexes to put the residents at ease, to let them know that there was a police presence and to fulfill the department's agreement with the housing authority. According to Lipeika, the majority of problems within housing complexes were created by people who did not live there and were trespassing.

[4] Lipeika described a "cement retaining wall with bushes in, like, the retaining wall area." Photographs of the courtyard were placed into evidence and published to the jury. The photographs depict a courtyard surrounded by large concrete planters. One of the planters consists of two arms of a right angle bounding two sides of the courtyard. A long bench is set next to one arm of the planter and a picnic table is situated close to the corner of the angle. A shrubbery hedge is planted in the arm of the planter behind the bench and one side of the picnic table.

[5] The individuals in the courtyard were the defendant, Kason Sumpter, Altolane Jackson, Brian Elmore, Jefferson Sumpter, and Janet Cruz. Lipeika's subsequent investigation disclosed that none of the individuals was a resident of Washington Village.

[6] Jefferson Sumpter and Janet Cruz were "hanging over by the bench" in a different part of the courtyard. According to Lipeika, they appeared to be highly intoxicated and did not approach the picnic table.

[7] Lipeika testified on the basis of his training and experience that when armed subjects are approached by police, they "usually try to discard . . . or stash" a firearm so that it is not detected on their person. Depending on the circumstances, a subject usually places the gun close enough to access it.

[8] Russell's work was reviewed for accuracy by a technical reviewer at the laboratory.

[9] Although § 53a-217 (a) (1) was the subject of technical amendments in 2015; see Public Acts, Spec. Sess., June, 2015, No. 15-2, § 6; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[10] Throughout his briefs on appeal, the defendant has used the term "exercised dominion *and* control." (Emphasis added.) The language of General Statutes § 53a-3 (2) is "exercise dominion *or* control . . . ." (Emphasis added.)

[11] The parties stipulated that the defendant had a prior felony conviction.

[12] Most often, plain view, or the plain view doctrine, arises in the context of a fourth amendment illegal search and seizure claim, which is not present in this case. The defendant has not claimed that he had a reasonable expecta-

tion of privacy in the courtyard. "The plain view doctrine is based upon the premise that the police need not ignore incriminating evidence in plain view while they are . . . entitled to be in a position to view the items seized." (Internal quotation marks omitted.) *State* v. *Arokium*, 143 Conn. App. 419, 433, 71 A.3d 569, cert. denied, 310 Conn. 904, 75 A.3d 31 (2013); see also *Coolidge* v. *New Hampshire*, 403 U.S. 443, 464–73, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *State* v. *Ruth*, 181 Conn. 187, 193, 435 A.2d 3 (1980).

[13] The state placed into evidence photographs of three signs posted in the courtyard: one sign stated "PRIVATE PROPERTY NO TRESPASSING"; another stated "NOTICE NO TRESPASSING LOITERING SOLICITING ON THIS PROPERTY"; and another sign stated in part "The Community Policing Division has a partnership with the Norwalk Housing Authority . . . . We are committed to making our communities a better, safer, drug free environment where residents and their children can enjoy their right to peace of mind. Officers will be conducting random patrols to specifically address issues . . . ."

[14] Following oral argument in this court, defense counsel submitted a letter pursuant to Practice Book § 67-10, in which she brought the case of *State* v. *Skipper*, 228 Conn. 610, 613–24, 637 A.2d 1101 (1994), to our attention, claiming that the case was pertinent to the state's argument regarding the manner in which the defendant's DNA came in contact with the gun. *Skipper* concerned the determination of paternity. The statistical probability of paternity at issue is distinguishable from the present case in that the probability of paternity was calculated from DNA evidence on the fifty-fifty assumption that intercourse had occurred.

[15] In *Arnold*, the victim stated to a 911 operator and responding police that the defendant had a gun. *United States* v. *Arnold*, supra, 486 F.3d 179–80. In *Vichitvongsa*, the defendant made telephone calls from jail in which he stated that he had been pulled over and the police caught him with a gun that he referred to as "[t]he Smitty" and "my burner," which are common references to handguns. (Emphasis omitted; internal quotation marks omitted.) *United States* v. *Vichitvongsa*, supra, 819 F.3d 276.

[16] In their final arguments, both the prosecutor and defense counsel stated that the jury was to follow the court's instructions as to the law.

[17] The record discloses that defense counsel also argued that the state had "to prove, beyond a reasonable doubt, that [the defendant] knew, or had knowledge of, that he was in possession of this weapon, that he knew where it was and that he had access to it." We note that neither argument mirrors *State* v. *Hill*, supra, 201 Conn. 516 ("control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent").

[18] On appeal, the defendant does not claim that the court improperly charged the jury, but argues that the instruction was insufficient to clarify the element of dominion or control. "[A] defendant is entitled to have the jury correctly and adequately instructed on the pertinent principles of substantive law. . . . Nonetheless, [the] instructions need not be perfect, as long as they are legally correct, adapted to the issues and sufficient for the jury's guidance." (Citation omitted; internal quotation marks omitted.) *State* v. *Roger B.*, 297 Conn. 607, 618, 999 A.2d 752 (2010). More significantly, appellate courts do not review a waived claim of instructional error that is folded into a claim of prosecutorial impropriety. See *State* v. *Hearl*, 182 Conn. App. 237, 253 n.18, 190 A.3d 42, cert. denied, 330 Conn. 903, 192 A.3d 425 (2018).

The defendant also criticizes the trial court for not issuing a curative instruction for the prosecutor's alleged misstatement of the law but acknowledges that he did not request a curative instruction. See *State* v. *Fauci*, 282 Conn. 23, 53, 917 A.2d 978 (2007) (trial court did not give curative instruction, as defense did not object or request curative instruction). "Given the defendant's failure to object, only instances of grossly egregious [impropriety] will be severe enough to mandate reversal." (Internal quotation marks omitted.) *State* v. *Singleton*, 95 Conn. App. 492, 504, 897 A.2d 636, cert. denied, 279 Conn. 904, 901 A.2d 1228 (2006).

[19] The court instructed the jury that the parties had stipulated that at the time of the charged offense, the defendant previously had been convicted of a felony and was, therefore, prohibited from possessing a pistol or revolver.

[20] Although the parties refer to the "model" jury instructions, the Judicial Branch does not. The collection of jury charges for criminal cases prepared by the Judicial Branch is simply referred to as "Criminal Jury Instructions" and contains the following disclaimer: "This collection of jury instructions . . . is intended as a guide for judges and attorneys in constructing charges and requests to charge. The use of these instructions is entirely discretionary

and their publication by the Judicial Branch is *not a guarantee of their legal sufficiency*." (Emphasis added.) Connecticut Judicial Branch Criminal Jury Instructions, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited March 4, 2019). Nevertheless, because the parties use the shorthand term "model" charges, we adopt that nomenclature in this opinion.

[21] In *Reyes*, the defendant asked our Supreme Court to exercise its supervisory authority over the administration of justice to require judges to use the pattern criminal jury instructions found on the Judicial Branch website. *State* v. *Reyes*, supra, 325 Conn. 821 n.3. Our Supreme Court declined the defendant's invitation, noting the express caution on the website that the instructions are intended as a guide in constructing charges and requests to charge, and that their use is entirely discretionary and "their publication by the Judicial Branch *is not a guarantee of their legal sufficiency*." (Emphasis in original; internal quotation marks omitted.) Id., 821–22 n.3.

[22] The issue in *Bellamy* was whether the defendant had waived his unpreserved jury instruction claim under the rule established in *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011), and whether the *Kitchens* rule should be overturned. *State* v. *Bellamy*, supra, 323 Conn. 402–403. Our Supreme Court declined to overturn the *Kitchens* rule. Id., 439.

[23] The example cited by Justice Palmer in *Bellamy* concerned a jury instruction given in the case of *State* v. *Johnson*, supra, 137 Conn. App. 760. On appeal in *Johnson*, our Supreme Court concluded that the standard jury instructions on nonexclusive constructive possession of contraband that the trial court used at the defendant's trial was constitutionally deficient. *State* v. *Bellamy*, supra, 323 Conn. 501 (*Palmer, J.*, concurring). The instruction at issue in the present case was not the instruction given in *Johnson*. See *State* v. *Johnson*, supra, 761 n.9.

[24] Again, the defendant does not claim that the court improperly charged the jury, but if he had, the state may well have contended that he waived any instructional error pursuant to *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011).

[25] In the present case, the defendant's claim concerns the DNA evidence, but it is not specifically directed toward the prosecutor's discussion of the DNA evidence itself. The defendant's claim is directed toward the logic of the prosecutor's argument.

[26] In his brief on appeal, the defendant states in one sentence that the state not only improperly argued that the hypotheticals posited to Russell were not evidence, but that "it also improperly shifted the burden to the defense to proffer evidence of a sneeze, or that someone else touched [the defendant] and transferred the DNA." The state properly argued that Russell's testimony merely provided the jury with examples of how DNA can be transferred, and because there was no evidence in the present case of the defendant's DNA being transferred under the circumstances of any hypothetical, the jury could not speculate. The defendant was under no obligation to provide any evidence as to how the DNA came to be on the gun, but he certainly could have done so if such evidence was available to him. Moreover, defense counsel was not "precluded from arguing that the inconclusive nature of the DNA evidence left reasonable doubt about the defendant's guilt . . . ." *State* v. *Brett B.*, supra, 186 Conn. App. 583–84.

--------