# STATE OF CONNECTICUT *v.* ANDRE DAWSON
## (SC 20361)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of criminal possession of a pistol or revolver and criminal trespass
in the third degree, the defendant appealed to the Appellate Court,
claiming, inter alia, that there was insufficient evidence to support his

State *v.* Dawson

conviction of criminal possession of a pistol or revolver. Police officers had been patrolling a housing complex when they entered a courtyard and saw six individuals, including the defendant. While two officers spoke with the defendant and three others, S, J and E, who were seated at a picnic table near a corner formed by cement walls, a third officer, L, stepped onto the wall behind the defendant and immediately saw in plain view a gun lying in the corner by some bushes. S and J were closest to the gun, and the defendant was approximately four to five feet away from it. A few days later, the defendant, S, J and E each voluntarily provided the police with a DNA sample, and, thereafter, the police used swabs to collect DNA from the gun and ammunition that was removed from the gun. The swabs and the DNA samples were delivered to the state forensics laboratory, where R, a forensic science examiner, generated a partial DNA profile from a small, partially degraded touch DNA sample extracted from the swabs and compared it with the DNA samples provided by the defendant, S, J and E. R's analysis produced scientifically viable and accurate results that eliminated S, J and E as possible contributors to the DNA profile but could not eliminate the defendant as a contributor. On appeal to the Appellate Court, the defendant specifically contended that there was insufficient evidence of his knowledge of the gun and no evidence to prove his dominion or control over it. The Appellate Court affirmed the judgment of conviction, concluding, inter alia, that there was sufficient circumstantial evidence from which the jury reasonably could have inferred that the defendant was in possession of the gun when he entered the courtyard, that he put it near the bushes when the police arrived so that it would not be found on his person, and that he intended to retrieve it when the police left the courtyard. On the granting of certification, the defendant appealed to this court. *Held* that the Appellate Court incorrectly concluded that the state had adduced sufficient evidence at trial to support the defendant's conviction of criminal possession of a pistol or revolver: the fact that the gun was in plain view and appeared to have been placed there just before the police arrived did not support a reasonable inference that the defendant placed it there or had knowledge of it and the intent to exercise dominion or control over it, it was not reasonable to infer from the evidence that it was the defendant rather than one of the other individuals seated at the picnic table who, when alerted to the presence of the police, stashed the gun nearby to avoid being found with it, and mere proximity to contraband, in the absence of other incriminating conduct, statements, or circumstances, is insufficient to support a finding of constructive possession, and it was undisputed that the defendant did not display any incriminating conduct; moreover, the DNA evidence presented by the state, standing alone or in combination with other evidence, was insufficient to support the defendant's conviction insofar as there were too many unknowns for the jury to have found beyond a reasonable doubt that the defendant

State *v.* Dawson

had even touched the gun, much less that he was aware of its presence near where he was seated or that he intended to exercise dominion or control over it, R having indicated during her testimony that she was unable to determine how or when the defendant's DNA was deposited on the gun, that the DNA sample established that at least one other person's DNA was on the gun, that, although S, J and E had been excluded as contributors to the DNA sample, that did not mean that their DNA was not on the gun, but, rather, that it was not detected, that two individuals who were present in the courtyard were not DNA tested, and that she could not definitively say that the DNA profile found on the gun was that of the defendant, only that he could not be excluded as a contributor.

(*One justice dissenting*)

Argued February 17—officially released August 13, 2021*

*Procedural History*

Substitute information charging the defendant with the crimes of criminal possession of a pistol or revolver and criminal trespass in the third degree, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number twenty, and tried to the jury before *Hernandez, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Lavine, Bright* and *Harper, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Reversed in part*; *judgment directed*.

*Erica A. Barber*, assigned counsel, for the appellant (defendant).

*Nancy L. Walker*, assistant state's attorney, with whom, on the brief, were *Paul J. Ferencek*, state's attorney, and *Nadia Prinz*, former assistant state's attorney, for the appellee (state).

* August 13, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

340 Conn. 136 DECEMBER, 2021 139

State *v.* Dawson

*Opinion*

KELLER, J. The defendant, Andre Dawson, appeals[1] from the judgment of the Appellate Court affirming his conviction, rendered following a jury trial, of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c.[2] The defendant claims that the Appellate Court incorrectly concluded that the state had adduced sufficient evidence at trial to support his conviction. We agree and, accordingly, reverse in part the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "At approximately 9:35 p.m. on August 10, 2014, Police Officers Kyle Lipeika, Stephen Cowf, and Michael Pugliese (officers) were patrolling Washington Village, a housing complex in Norwalk. The officers were members of the Street Crimes Task Force within the Special Services Division (task force) of the Norwalk Police Department (department).[3] They had entered Washington Village

---

[1] This court granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the evidence was sufficient to support the defendant's conviction of criminal possession of a pistol or revolver?" *State* v. *Dawson*, 333 Conn. 906, 215 A.3d 731 (2019).

[2] Although § 53a-217c has been the subject of certain technical amendments since 2014; see, e.g., Public Acts 2016, No. 16-34, §16; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 53a-217c.

The defendant was also convicted of criminal trespass in the third degree in violation of General Statutes § 53a-109 (a) (1). He did not challenge that conviction on appeal to the Appellate Court; nor does he do so here.

[3] "The task force's objective was to deter street level crime by providing 'high visibility police patrol in high crime areas throughout' . . . Norwalk. The department had an agreement with the Norwalk Housing Authority to deter trespassing in housing complexes. The task force undertook foot patrols in housing complexes to put the residents at ease, to let them know that there was a police presence and to fulfill the department's agreement with the housing authority. According to Lipeika, the majority of problems within housing complexes were created by people who did not live there and were trespassing." *State* v. *Dawson*, 118 Conn. App. 532, 536 n.3, 205 A.3d 662 (2019).

from Day Street and walked through an alley that led to a courtyard between buildings 104 and 304. Lipeika was shining a flashlight in order for people in the courtyard to see the officers approaching. Lipeika and Cowf were wearing uniforms with yellow letters identifying them[selves] as police. When the officers entered the courtyard, they saw benches, a picnic table, a cement retaining wall,[4] bushes, a playground, and six individuals.[5]

"The defendant, Kason Sumpter, and Altolane Jackson were seated at the picnic table near a corner formed by the cement walls of a planter. The defendant was seated with his back to the cement wall without bushes. . . . Brian Elmore first walked away from the officers but turned back and sat at the picnic table.[6] To establish rapport with the individuals sitting at the table, the officers engaged them in conversation. As was their practice, the officers scanned the area for firearms and narcotics that the individuals may have tried to con-

---

[4] "Lipeika described a 'cement retaining wall with bushes in . . . the retaining wall area.' Photographs of the courtyard were placed into evidence and published to the jury. The photographs depict a courtyard surrounded by large concrete planters. One of the planters consists of two arms of a right angle bounding two sides of the courtyard. A long bench is set next to one arm of the planter, and a picnic table is situated close to the corner of the angle. A shrubbery hedge is planted in the arm of the planter behind the bench and one side of the picnic table." *State* v. *Dawson*, 188 Conn. App. 532, 537 n.4, 215 A.3d 731 (2019).

[5] "The individuals in the courtyard were the defendant, Kason Sumpter, Altolane Jackson, Brian Elmore, Jefferson Sumpter, and Janet Cruz. Lipeika's subsequent investigation disclosed that none of the individuals was a resident of Washington Village." *State* v. *Dawson*, 188 Conn. App. 532, 537 n.5, 215 A.3d 731 (2019).

[6] "Jefferson Sumpter and Janet Cruz were [seated on a] bench in a different part of the courtyard. According to Lipeika, they appeared to be highly intoxicated and did not approach the picnic table." (Internal quotation marks omitted.) *State* v. *Dawson*, 188 Conn. App. 532, 537 n.6, 215 A.3d 731 (2019).

State *v.* Dawson

ceal.[7] As Cowf and Pugliese conversed with the individuals at the picnic table, Lipeika stepped onto the wall behind the defendant and immediately saw in plain view a gun lying in the corner by the bushes.

"According to Lipeika, the gun looked like it had been placed there just before he discovered it because the gun was resting on top of leaves, was not covered with dirt or debris, except a twig, and appeared to be free of rust and dust. Jackson and Kason Sumpter were seated closest to the gun, two or three feet away from it. The defendant was seated four to five feet away from the gun.[8] None of the officers who testified [at trial] had seen the defendant touch the gun.

"When Lipeika discovered the gun, he drew his weapon and ordered the six individuals in the courtyard to show their hands. Pugliese and Cowf detained the individuals and moved them away from the gun. Lipeika radioed for more officers and guarded the gun until the scene was secured. The additional officers photographed the scene and the gun. Then, Lipeika put on a new pair of rubber gloves and seized the loaded gun in accordance with department procedures. He removed the ammunition from the gun, a revolver with a two

[7] "Lipeika testified on the basis of his training and experience that, when armed subjects are approached by police, they 'usually try to discard . . . or stash' a firearm so that it is not detected on their person. Depending on the circumstances, a subject usually places the gun close enough to access it." *State* v. *Dawson*, 188 Conn. App. 532, 537 n.7, 215 A.3d 731 (2019).

[8] At trial, Officer Lipeika testified to the seating arrangement of the individuals at the picnic table and the approximate distance each individual was from the location where the gun was found. Kason Sumpter was sitting on the side of the picnic table running parallel to the retaining wall bordered by the bushes, with the gun to his right, approximately two to three feet away. Jackson was sitting on the other side of the picnic table, which ran parallel to the retaining wall without bushes. The gun was to his left, approximately two to three feet away. The defendant was seated directly next to Jackson, approximately four to five feet from the gun. It is unclear from the record where Elmore was sitting before the officers arrived, and he walked away from the picnic table.

State *v.* Dawson

inch barrel, and took the ammunition and the gun to the police station.

"Days later, at Lipeika's request, the defendant, Kason Sumpter, Jackson, and Elmore went to the police station; each of them voluntarily provided a [DNA] sample . . . . None of them claimed the gun was his. The defendant also provided a written statement in which he stated that he 'walked through Washington Village to Water Street, stopped to talk when officers came through and [they] found a handgun in the bushes in the area [where he] was talking.'

"Jackson, too, provided a written statement and testified at trial that he was in the Washington Village courtyard when the defendant walked through and stopped to talk. He also stated that, ten minutes later, someone said 'police,' and everyone looked up. Jackson did not see the defendant with a gun, and he did not see the defendant walk toward the bushes where the gun was found. Jackson confirmed that the gun did not belong to him.

"On August 28, 2014, Arthur Weisgerber, a lieutenant in the department, tested the gun for latent fingerprints but did not find any suitable for identification. Thereafter, he used swabs to collect DNA from the gun and the ammunition that Lipeika had removed from the gun. He placed the swabs in an envelope. In addition, Weisgerber fired the gun and determined that it was operable. The swabs and the DNA samples provided by the defendant, Kason Sumpter, Jackson, and Elmore were delivered to the state forensics laboratory (laboratory), where Melanie Russell, a forensic science examiner, conducted DNA analyses of the materials. Russell provided expert testimony at trial.

"The laboratory has procedures to protect DNA samples and evidence from contamination. It also prescribes how laboratory analysis of DNA is to be conducted.

State *v.* Dawson

The DNA that Weisgerber swabbed from the gun and ammunition is touch DNA because it was deposited on the gun or ammunition when someone [either] touched them directly, [or his DNA became present on them] through a secondary transfer or . . . aerosolization, that is, coughing or sneezing. Touch DNA comes from skin cells left behind when a person touches an object. The quantity and quality of touch DNA vary according to the character of the object's surface, i.e., rough or smooth, and the length of time the DNA has been on the object. DNA degrades with time due to environmental factors, such as heat and moisture. Degradation makes it difficult to amplify the DNA and, in some cases, even to detect DNA.

"The quantity of DNA on the swabs was small, and the DNA was partially degraded. Nonetheless, Russell was able to extract a DNA solution of 7.16 picograms per microliter from the swabs. Although she was able to amplify a sample of about seventy picograms of DNA, 1000 picograms is the ideal amount for DNA analysis. A low yield sample will provide a DNA profile but usually not a full profile. Russell was able to generate a partial profile and obtained results at seven out of fifteen loci tested. The profile Russell obtained from the gun and ammunition consisted of a mixture of DNA, signifying the presence of more than one person's DNA. She was able to compare the DNA from the swabs with the samples provided by the defendant, Kason Sumpter, Elmore and Jackson in a scientifically accurate way and to obtain scientifically viable and accurate results. Her analysis eliminated Kason Sumpter, Elmore and Jackson as possible contributors to the DNA profile she developed from the swabs. The defendant, however, could not be eliminated as a contributor. The expected frequency of individuals who could not be eliminated as a contributor to the DNA profile is approximately one in 1.5 million in the African-American population,

State *v.* Dawson

one in 3.5 million in the Caucasian population, and one in 930,000 in the Hispanic population.[9] The defendant is African-American.

"A warrant was issued for the defendant's arrest on September 25, 2014. . . . Subsequently, the state filed an amended long form information charging the defendant with criminal possession of a pistol or revolver in violation of § 53a-217c and criminal trespass in violation of General Statutes § 53a-109 (a) (1). . . . [Following a trial] [t]he jury found the defendant guilty of both charges." (Citation omitted; footnote added; footnotes in original; footnote omitted.) *State* v. *Dawson*, 188 Conn. App. 532, 536–41, 205 A.3d 662 (2019). The court sentenced the defendant to a term of ten years of imprisonment, two years of which were a mandatory minimum, on the conviction of criminal possession of a pistol or revolver, and a term of three months of imprisonment on the conviction of criminal trespass in the third degree, with the sentences to run consecutively, for a total effective sentence of ten years and three months of imprisonment. Id., 541. Thereafter, the defendant appealed to the Appellate Court.

On appeal to the Appellate Court, the defendant claimed, inter alia, that "there was insufficient evidence to convict him of criminal possession of a pistol or revolver because there was insufficient evidence of his knowledge of the gun and no evidence to prove his dominion or control over it." Id. The Appellate Court rejected the defendant's claim, concluding that "there was sufficient circumstantial evidence [from] which the jury reasonably could have inferred that the defendant was in possession of the gun when he entered the courtyard, that he put it near the bushes when the police

[9] "Russell's work was reviewed for accuracy by a technical reviewer at the laboratory." *State* v. *Dawson*, 188 Conn. App. 532, 540 n.8, 215 A.3d 731 (2019).

State *v.* Dawson

arrived so that it would not be found on his person, and that he intended to retrieve the gun when the police left.'' Id., 555–56. Specifically, the court reasoned that, because ''the gun was found in plain view and appeared to have been placed near the bushes recently,'' the jury reasonably could have ''inferred that the person who put the gun near the bushes did not abandon it and leave the courtyard but, instead, was one of the six individuals in the courtyard when the officers arrived.'' Id., 546. The court further reasoned that the jury reasonably could have found, on the basis of Lipeika's testimony, that ''the defendant quickly put the gun on the wall near the bushes to avoid being found with it'' when the police arrived because, ''when individuals who have a gun in their possession become aware of a police presence, they try to 'discard . . . or stash' the gun so that they will not be detected with it,'' and they will typically ''put the gun in a place close enough to be 'accessible' to them.'' Id., 547. Finally, the court reasoned that, because ''the defendant was the only person at the picnic table who could not be eliminated as a contributor to the DNA profile found on the gun and ammunition''; id.; it was reasonable to infer that ''the defendant once had the gun on his person and intended to do so again when the police left the courtyard.'' Id., 548.

Although the Appellate Court acknowledged that ''none of the [aforementioned] factors alone is direct evidence of the defendant's knowledge of the gun's presence or his intent to possess it''; id., 547; it concluded that ''the cumulative force of the circumstantial evidence was sufficient for the jury reasonably to infer that the defendant knew of the gun and was in constructive possession of it.'' Id., 547–48.

On appeal, the defendant claims that the Appellate Court incorrectly determined that the evidence was sufficient to support his conviction. Specifically, the

State *v.* Dawson

defendant argues that the Appellate Court incorrectly reasoned that, merely because he was in a place where the gun was present and trace amounts of DNA consistent with his DNA profile came into contact with the gun at an unknown time and in an unknown manner, a rational jury reasonably could have found beyond a reasonable doubt that he constructively possessed the gun. In so arguing, the defendant asserts that, without further corroborative proof, the DNA evidence was insufficient as a matter of law to establish his guilt because DNA evidence, standing alone, does not establish that he knowingly exercised dominion or control over the gun. The state counters that the Appellate Court correctly concluded that the cumulative evidence and inferences logically flowing therefrom support the jury's conclusion that the defendant constructively possessed the gun beyond a reasonable doubt. We agree with the defendant.

In reviewing criminal convictions for the sufficiency of the evidence, we apply a well established two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *James E.*, 327 Conn. 212, 218, 173 A.3d 380 (2017). "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 187, 193 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019). Although "proof beyond a reasonable doubt does not mean proof beyond all possible doubt

State *v.* Dawson

. . . [or] require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier [of fact], would have resulted in an acquittal''; (internal quotation marks omitted) *State* v. *Fagan*, 280 Conn. 69, 80, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007); it does not ''satisfy the [c]onstitution to have a jury determine that the defendant is *probably* guilty.'' (Emphasis in original; internal quotation marks omitted.) *United States* v. *Valle*, 807 F.3d 508, 515 (2d Cir. 2015). ''[When] the evidence is in equipoise or equal, the [s]tate has not sustained its burden [of proof] . . . .'' (Internal quotation marks omitted.) *State* v. *Stovall*, 316 Conn. 514, 527, 115 A.3d 1071 (2015).

Section 53a-217c provides in relevant part that a defendant is guilty of criminal possession of a pistol or revolver if the defendant ''possesses'' a pistol or revolver, and he has had a prior felony conviction. On appeal, the defendant challenges only the jury's finding that he possessed a pistol or revolver within the meaning of § 53a-217c.[10]

The term '' '[p]ossess' means to have physical possession or otherwise to exercise dominion or control over tangible property . . . .'' General Statutes § 53a-3 (2). We have previously explained that there are two kinds of possession, actual and constructive. Actual possession ''requires the defendant to have had direct physical contact with the [contraband].'' (Internal quotation marks omitted.) *State* v. *Johnson*, 137 Conn. App. 733, 740, 49 A.3d 1046 (2012), rev'd in part on other grounds, 316 Conn. 34, 111 A.3d 447 (2015), and aff'd, 316 Conn. 45, 111 A.3d 436 (2015). Alternatively, ''constructive possession is possession without direct physical contact. . . . It can mean an appreciable ability to guide

---

[10] The parties stipulated to the fact that the defendant had a prior felony conviction for purposes of § 53a-217c.

State *v.* Dawson

the destiny of the [contraband] . . . and contemplates a continuing relationship between the controlling entity and the object being controlled.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Rhodes*, 335 Conn. 226, 233–34, 249 A.3d 683 (2020). To establish constructive possession, the control "must be exercised intentionally and with knowledge of the character of the controlled object.'' *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986). "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . .'' General Statutes § 53a-3 (11).

Moreover, "[when] the defendant is not in exclusive possession of the premises where the [contraband is] found, it may not be inferred that [the defendant] knew of the presence of the [contraband] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference.'' (Internal quotation marks omitted.) *State* v. *Winfrey*, 302 Conn. 195, 210–11, 24 A.3d 1218 (2011). Such evidence may include, for example, "connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise . . . .'' (Internal quotation marks omitted.) *State* v. *Bowens*, 118 Conn. App. 112, 125, 982 A.2d 1089 (2009), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010). Accordingly, although "mere presence is not enough to support an inference of dominion or control, [when] there are other pieces of evidence tying the defendant to dominion [or] control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime.'' (Internal quotation marks omitted.) *State* v. *Martin*, 285 Conn. 135, 150, 939 A.2d 524, cert. denied, 555 U.S. 859, 129 S. Ct. 133, 172 L. Ed. 2d 101 (2008); see also *State*

State *v.* Dawson

v. *Rhodes*, supra, 335 Conn. 241 ("some connection or nexus individually linking the defendant to the contraband is required" (internal quotation marks omitted)); *State* v. *Delossantos*, 211 Conn. 258, 278, 559 A.2d 164 ("[p]resence alone, unilluminated by other facts is insufficient proof of possession" (internal quotation marks omitted)), cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989).

In the present case, there was no direct evidence that the defendant *actually* possessed the gun, and, accordingly, the state proceeded at trial under a theory of constructive possession. Thus, to convict the defendant under § 53a-217c, the state had the burden of proving beyond a reasonable doubt that the defendant knew that the gun was on the retaining wall and that he intended to exercise dominion or control over it. See, e.g., *State* v. *Hill*, supra, 201 Conn. 516–17. Further, because the defendant was not in exclusive possession of the location where the gun was found,[11] the state was required to present other evidence from which the jury reasonably could have inferred knowledge of and intent to exercise dominion or control over the gun. See, e.g., *State* v. *Winfrey*, supra, 302 Conn. 210–11.

As we have previously explained, "[a] case for constructive possession of a firearm often is necessarily built on inferences, and a jury may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Rhodes*, supra, 335 Conn. 237. Although "[p]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis . . . it must suffice to produce in the mind of the trier a

---

[11] Of course, there can be no serious argument that the defendant was in exclusive possession of the courtyard in Washington Village. After all, he was charged with and convicted of trespassing as a result of his presence there on the night in question.

State *v.* Dawson

reasonable belief in the probability of the existence of the material fact.'' (Internal quotation marks omitted.) Id., 238. ''[I]f the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation.'' (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 768–69, 36 A.3d 670 (2012). Therefore, ''[b]ecause [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic . . . that [a]ny [inference] drawn must be rational and founded upon the evidence.'' (Internal quotation marks omitted.) Id., 768. In sum, although we do not ''sit as the 'seventh juror' when we review the sufficiency of the evidence''; *State* v. *Ford*, 230 Conn. 686, 693, 646 A.2d 147 (1994); we also must ''be faithful to the constitutional requirement that no person be convicted unless the [g]overnment has proven guilt beyond a reasonable doubt [and] take seriously our obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt beyond a reasonable doubt.'' (Emphasis in original; internal quotation marks omitted.) *United States* v. *Valle*, supra, 807 F.3d 515.

Our review of the cumulative force of the evidence leads us to the conclusion that the jury could not reasonably have concluded beyond a reasonable doubt that the defendant had knowledge of the gun and, with intent, exercised dominion or control over it. Therefore, the jury could not reasonably have found, beyond a reasonable doubt, that he constructively possessed the gun for purposes of a conviction under § 53a-217c.

The state claims, and the Appellate Court concluded, that the following three circumstances supported the

State *v.* Dawson

jury's finding that the defendant constructively possessed the gun: Lipeika's testimony that the gun was found in plain view and appeared to have been placed near the bushes recently; Lipeika's testimony that, when individuals who have an illegal gun in their possession become aware of a police presence, they try to discard or stash the gun so that they are not found with it; and Lipeika's testimony that, when individuals with a gun seek to discard or stash it, they put it in a place close enough to be accessible to them. None of these circumstances, alone or in combination with the others, supports the conclusion that the defendant constructively possessed the gun.

The record indicates that the defendant was seated at a picnic table with two other individuals, Kason Sumpter and Jackson. A third individual, Elmore, was originally seated at the picnic table, walked away when the police officers approached, and then returned. Notably, the defendant was seated approximately four to five feet from the gun, whereas Jackson and Kason Sumpter were seated approximately two to three feet from it. Moreover, there were two other individuals, Jefferson Sumpter and Janet Cruz, who were seated nearby on a bench. The fact that the gun was "in plain view" and appeared to have been placed there recently does not support a reasonable inference that the *defendant* placed it there or had knowledge of it and the power and intent to exercise dominion or control over it.

The second and third circumstances similarly do not implicate the defendant more than any of the other five individuals present in the courtyard that night. As mentioned, the defendant was seated furthest away from the gun, with Jackson seated between him and the retaining wall where the gun was located and Kason Sumpter seated with his back to the bushes, approximately two to three feet from where the gun was

State *v.* Dawson

located. Lipeika conceded that the defendant was not within arm's reach of the gun, stating, "I believe [he was] like four to five feet away. . . . So, I don't think that that would be within an arm's reach . . . ." Further, when asked if it was his testimony that the defendant was *not* close enough to reach out and grab the gun, Lipeika responded, "[y]eah." On the other hand, both Jackson and Kason Sumpter were, according to Lipeika, "within arm's reach of [the gun]," approximately two to three feet away. Accordingly, there is simply no reason to think, on the basis of Lipeika's testimony, that it was the defendant rather than one of the other individuals seated at the picnic table who had stashed the gun nearby to avoid being found with it, as the state argued at trial. In fact, to the extent that Lipeika's testimony is probative of who placed the gun near the bushes, it would seem to suggest Jackson or Kason Sumpter, given their closer proximity to the retaining wall.

Indeed, what the state's argument essentially boils down to, at least insofar as it rests on Lipeika's testimony, is that, because the defendant was in close proximity to the gun, it was reasonable for the jury to infer that he constructively possessed it. We repeatedly have stated, however, that mere proximity to contraband, in the absence of other incriminating conduct, statements, or circumstances, is insufficient to support a finding of constructive possession. See, e.g., *State* v. *Martin*, supra, 285 Conn. 150. In the present case, it is undisputed that the defendant did not display any kind of incriminating conduct. To the contrary, the police, as they approached the courtyard, observed no furtive movements by the defendant toward the location of the gun. The defendant, moreover, did not distinguish himself from others by attempting to flee, cooperated with the police when they detained him, did not provide any incriminating statements, and voluntarily provided

State *v.* Dawson

a DNA sample. Accordingly, we conclude that the jury could not reasonably have found, without resort to impermissible surmise or conjecture, that the defendant had knowledge of the gun and the intent to exercise dominion or control over it merely because, according to Lipeika, individuals in possession of an illegal firearm will often seek to "discard . . . or stash" it nearby when alerted to the presence of the police.

The state contends, however, and the Appellate Court concluded, that, because "the defendant was the only person at the picnic table who could not be eliminated as a contributor to the DNA profile found on the gun and ammunition"; *State* v. *Dawson*, supra, 188 Conn. App. 547; it was reasonable for the jury to infer that the defendant constructively possessed the gun. On appeal, the defendant argues that the DNA evidence, standing alone or in combination with any other evidence, does not establish that he constructively possessed the gun. We agree with the defendant.

The following additional facts are relevant to our analysis. The DNA evidence presented by the state at trial is classified as "touch DNA," which the state's DNA expert, Russell, testified is a term "used to describe DNA that is left behind just by touching an object . . . ." Notwithstanding its name, however, touch DNA does not necessarily indicate a person's direct contact with the object. Rather, according to Russell, abandoned skin cells, which make up touch DNA, can be left behind through primary transfer, secondary transfer, or aerosolization. Primary or "touch" transfer occurs, for example, when you directly touch or pick up an object. Secondary transfer, alternatively, occurs when, for example, person A bleeds onto a table and, subsequently, person B walks by the table, accidentally brushes against it, and then sits in a chair. Person A's blood can potentially be on that chair via secondary transfer, although person A personally never came into

State *v.* Dawson

contact with the chair. Finally, skin cells can be deposited on an object through aerosolization, which, Russell explained, occurs when, for example, a person speaks, breathes, coughs, or sneezes on or near an item. Importantly, Russell testified that, when analyzing a sample, there is no way to determine whether DNA was deposited through primary transfer, secondary transfer, or aerosolization. Moreover, DNA is not always detectable, meaning that it is possible to have someone touch an object but not leave behind detectable DNA because, Russell testified, some people leave more of their skin cells behind than others, i.e., some people are better "shedders" of their DNA than others. There are also other factors that affect the amount of DNA left on an object, such as the length of contact, the roughness or smoothness of the surface, the type of contact, the existence or nonexistence of fluids, such as sweat, and degradation on the object. Russell testified that the DNA sample taken from the gun in this case was partially degraded. Degradation, Russell testified, is the process of material breaking down over time. Russell explained that, if a gun is properly handled by the police once seized and is not exposed to sunlight or warm temperatures, degradation would not be expected. If degradation is occurring under such circumstances, that could be an indication that the DNA had been on the object for some period of time, although there is no way to determine how long. In the present case, the DNA sample was consistent with experiencing degradation over time because there was no evidence that the gun was improperly handled by the police or was exposed to sunlight or heat after being seized.

Russell further testified that there was a very low quantity of touch DNA retrieved from the gun.[12] She

[12] We note that Lieutenant Weisgerber, who swabbed the gun for DNA, testified that he took two swabs and swabbed the portions of the gun that are typically swabbed for DNA, such as the cylinder, handle, barrel, and trigger area, and subsequently swabbed the ammunition found in the gun using the same two swabs. He explained that, because he swabbed the gun

State *v.* Dawson

explained that, to properly analyze touch DNA, a very small amount of genetic material is amplified to create a usable DNA profile. Then, employing a polymerase chain reaction process, the forensic examiner will identify and copy a specific DNA sequence at particular locations (loci), repeating the cycle to create a larger quantity of DNA. Russell testified that the optimal amount of DNA to amplify during the testing process is approximately 1000 picograms; however, in this case, she could test only seventy picograms of DNA, a low yielding sample, which she stated was common for touch DNA testing. Nonetheless, Russell was able to develop a partial DNA profile out of this low yield sample. She testified that it is "pretty rare" to obtain a full profile from a sample containing less than 100 picograms of DNA. Russell explained that, in most cases, and, specifically, in this case, contributors can still be eliminated from a low yield sample.

Russell also testified that the sample in the present case was consistent with being a mixture, meaning that there is DNA from more than one person on the object. Russell was able to determine that the mixture definitely included at least two people but could have included as many as four or more. Russell explained that mixtures are very common with forensic samples and that they can occur for a variety of reasons. Notably, Russell testified that, "if it's an object that multiple people have touched, especially if it's something that is found in a public place, a lot of times, there'll be

and ammunition using the same swabs, it would be impossible to know whether the DNA recovered from the gun came from the outside of the gun or from the ammunition. Russell similarly testified that she could not say if the DNA found on the gun came solely from the exterior of the gun or whether it came from the ammunition found in the gun. Of course, if there were evidence that the defendant's DNA could not be excluded from DNA found on the *ammunition*, a more reasonable inference could be drawn that he possessed the gun.

State *v.* Dawson

mixtures of many people's DNA on a single sample
. . . .''

Russell further testified that, based on her analysis,
the defendant's DNA profile could not be eliminated as
a contributor to the DNA mixture found on the gun.
Conversely, the other three individuals at the picnic
table—Kason Sumpter, Jackson, and Elmore—were
able to be eliminated as contributors.[13] Russell explained
that the conclusion that the sample was a mixed sample
was based on the fact that there were alleles present
at certain loci that matched the evidentiary profile but
did not match the defendant's known profile. Therefore,
Russell explained, "there would have to be someone
else contributing . . . to the evidentiary profile
. . . .'' Moreover, Russell conceded that, although
Kason Sumpter, Jackson, and Elmore were eliminated
as contributors, she could not say definitively that none
of their DNA was on the gun; just that there was
none detected.

On the basis of the foregoing forensic testimony, we
agree with the defendant that the DNA evidence pre-
sented by the state was insufficient to support his con-
viction, even when combined with Lipeika's testimony.
Indeed, the sheer lack of conclusiveness regarding the
DNA evidence in this case as it relates to the charged
crime is troubling for many reasons. First, Russell was
not able to determine how the defendant's DNA ended
up on the gun; she could not say whether it was via
primary transfer, secondary transfer, or aerosolization.
In other words, she could not determine whether the
defendant's DNA ended up on the gun because he
touched the gun, because he touched something that

---

[13] The two individuals who were seated nearby on a bench, Jefferson
Sumpter and Cruz, were not DNA tested. It is unclear whether they refused
to be tested, or whether the police failed to request a DNA sample from
them. They were, however, detained on the night in question when the
police seized the gun.

340 Conn. 136 DECEMBER, 2021 157

State *v.* Dawson

subsequently came into contact with the gun, or because he breathed, sneezed, or coughed near the gun. Second, Russell was unable to determine when the defendant's DNA was deposited on the gun; she could not say if it was deposited on or about August 10, 2014, or at some other undetermined time. Third, Russell was clear that the DNA sample was consistent with being a mixture, meaning that at least one other person's DNA was on the gun and possibly as many as three or four other people's DNA. Fourth, Russell conceded that, although the other three individuals at the picnic table were able to be excluded as contributors to the sample, that did not mean that their DNA was not on the gun; rather, it simply meant that it was not detected. Fifth, two individuals also present in the courtyard that night were not DNA tested. See footnote 13 of this opinion. Finally, Russell testified that she could not definitively say that the DNA profile developed was that of the defendant; she could determine only that he could not be excluded as a contributor. Accordingly, there were simply too many unknowns for the jury to find beyond a reasonable doubt that the defendant had even touched the gun, much less that he was aware of its presence near where he was seated on the night in question and intended to exercise dominion or control over it.[14]

---

[14] The dissenting justice disagrees with our conclusion that the evidence was insufficient to support a finding that the defendant intended to exercise dominion or control over the gun. He asserts that, in reviewing the defendant's sufficiency claim, we have violated the cardinal rule that a reviewing court "not sit as a 'seventh juror' . . . ." To the contrary, we have viewed the evidence in the light most favorable to the state, as we must, and simply have concluded that no rational trier of fact could have found proven beyond a reasonable doubt the essential elements of the crime of criminal possession of a pistol or revolver.

The dissenting justice's disagreement with us appears to be rooted in a fundamental misapprehension as to the state's theory at trial and the inferences that reasonably could be drawn from the evidence. Specifically, he argues, quoting *State* v. *Rhodes*, supra, 335 Conn. 236, that our resolution of the defendant's claim "is wholly inconsistent with our recent emphasis in *Rhodes* of 'the deference we must afford to the jury and the practical

State *v.* Dawson

The state nonetheless argues, citing *State* v. *Rhodes*, supra, 335 Conn. 226, and *State* v. *Bowens*, supra, 118 Conn. App. 112, that "[t]he circumstances here are at least as compelling as those in [which] our courts have found sufficient evidence of possession." We disagree that either case is remotely factually similar to the present case.

In *Rhodes*, the defendant was convicted of criminal possession of a firearm on the basis of evidence that she had driven "an armed passenger . . . around Bridgeport for ninety minutes [in her vehicle], including to and from the place where [the passenger] discharged [the] weapon." *State* v. *Rhodes*, supra, 335 Conn. 228. Although there was no evidence that the defendant physically touched the gun, we noted that there was "no serious argument at trial" that the defendant was unaware that the gun was in the vehicle. Id., 239. Indeed,

problems of proof in the nonexclusive possession context . . . when the accused's relationship to the premises is shared with others, and consequently the problems of knowledge and control intensify.' " Unlike *Rhodes*, this is a not a nonexclusive possession or shared premises case, in which the issue is whether the defendant's control over or relationship to the location where contraband was found was such as to support a reasonable inference that the contraband was under the defendant's dominion or control, even if nonexclusively. In *Rhodes*, we concluded that the defendant's ownership and operation of the vehicle in which the gun was transported, together with her knowledge that the gun was in the vehicle, in plain view and within arm's reach, supported a reasonable inference that she constructively possessed the gun, albeit nonexclusively. *State* v. *Rhodes*, supra, 335 Conn. 254–58. In the present case, the defendant had no such relationship to or control over the housing complex where the gun was found on the night in question such that the jury reasonably could infer dominion or control over the gun on the basis of that relationship. Cf. *United States* v. *Staten*, 581 F.2d 878, 883–84 (D.C. Cir. 1978) (defendant's constructive possession of drugs and drug paraphernalia was proven when defendant was found inside apartment where drugs were found, with key to apartment in his pocket). Nor was the state's theory of guilt premised on nonexclusive possession. Contrary to the dissenting justice's assertion, therefore, there were no "practical problems of proof in the nonexclusive possession [or shared premises] context" confronting the jury in this case. (Internal quotation marks omitted.)

State *v.* Dawson

the passenger had fired it in her presence. Id. We concluded that the jury reasonably could have found that the defendant had exercised dominion or control over the gun because, among other things, she had control over the vehicle in which the gun was located and attempted to evade the police both in the vehicle and on foot following the shooting. Id., 241–42.

Similarly, in *Bowens*, the evidence revealed that, "immediately after gunshots had been fired in two separate locations just a few blocks away from each other, witnesses saw a white car leaving the area of one of the shootings, the defendant was driving a white Ford Taurus, and he ran from the police after being stopped. Subsequently, a revolver was found along the route [along which] the police had chased the defendant as he fled from them, and the shell casing in the backseat of the Taurus was from a bullet fired from the revolver . . . ." *State* v. *Bowens*, supra, 118 Conn. App. 122. On the basis of that evidence, the Appellate Court held that "it [was] reasonable to infer from the evidence that the . . . revolver found along the chase route was in the Taurus that the defendant had been driving on the night in question"; id.; and, further, that "the evidence support[ed] a conclusion that the defendant knew of the revolver's presence in the Taurus and was aware of its character." Id., 122–23.

Unlike in *Rhodes* and *Bowens*, the state here failed to produce any evidence of the defendant's conduct or statements from which the jury reasonably could have found that he was aware of the gun's presence in the courtyard and that he intended to exercise dominion or control over it. Indeed, in both of those cases, the evidence established beyond any doubt that the guns had been in vehicles operated by the defendants shortly before their arrests. See *State* v. *Rhodes*, supra, 335 Conn. 241 ("the defendant's control of the car, at least in part, supported the jury's conclusion that she also

State *v.* Dawson

controlled the firearm''); see also *State* v. *Delossantos*, supra, 211 Conn. 277–78 (''[o]ne who owns or exercises dominion or control over a motor vehicle in which . . . contraband . . . is concealed may be deemed to possess the contraband'' (internal quotation marks omitted)); *State* v. *Bischoff*, 182 Conn. App. 563, 572, 190 A.3d 137 (''[k]nowledge that [contraband is] present and under a defendant's control when found in a defendant's home or car is more easily shown, of course, if the defendant has exclusive possession of the area in which the [contraband is] found'' (internal quotation marks omitted)), cert. denied, 330 Conn. 912, 193 A.3d 48 (2018).

In addition, in both *Rhodes* and *Bowens*, the defendants also exhibited highly incriminating behavior by exiting their vehicles and fleeing when the police approached them, leading the juries in those cases reasonably to conclude that the defendants both knew of the presence of the guns in their vehicles and had the requisite intent to possess and control them. See *State* v. *Scott*, 270 Conn. 92, 104–105, 851 A.2d 291 (2004) (''[f]light, when unexplained, tends to prove a consciousness of guilt . . . [and] is a form of circumstantial evidence'' (internal quotation marks omitted)), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005). Suffice it to say that the present case is wholly lacking the kind of evidence that courts have found sufficient to establish constructive possession of contraband. See, e.g., *State* v. *Butler*, 296 Conn. 62, 78–79, 993 A.2d 970 (2010) (evidence sufficient to support finding that defendant driver exercised dominion and control over narcotics found in center console of vehicle when defendant moved toward and closed console after being detained by police, coupled with evidence that defendant was drug dealer); *State* v. *Bruno*, 293 Conn. 127, 137–38, 975 A.2d 1253 (2009) (jury reasonably could have found that defendant had dominion and control

State *v.* Dawson

over narcotics when defendant possessed key to trunk where narcotics were found and twice opened trunk in response to requests to purchase narcotics); *State* v. *Crewe*, 193 Conn. App. 564, 572–73, 219 A.3d 886 (evidence supported inference that defendant constructively possessed narcotics found in vehicle when vehicle was parked in vacant parking lot behind cluster of bushes, in area known for narcotics trafficking, and defendant moved furtively when he was approached by police), cert. denied, 334 Conn. 901, 219 A.3d 800 (2019).

We further disagree with the Appellate Court and the state that the decision by the United States Court of Appeals for the Sixth Circuit in *United States* v. *Beverly*, 750 F.2d 34 (6th Cir. 1984)[15] is inapposite to this case. The defendant argued to the Appellate Court that *Beverly* supports his claim that the DNA evidence, alone or in combination with other evidence, was insufficient to prove his constructive possession of the gun. The Appellate Court determined that *Beverly* was distinguishable because, "[i]n the present case, a police officer found the gun in plain sight in a public space in close proximity to the defendant''; *State* v. *Dawson*, supra, 188 Conn. App. 551; whereas, in *Beverly*, a police officer, when executing a search warrant at the apartment of a third party, found the defendant and another man standing on either side of a waste basket that contained two guns, one of which had the defendant's fingerprint on it. Id. The state argues that the Appellate

---

[15] In *Beverly*, a police officer executed a search warrant on the apartment of a third person and, in so doing, found the defendant and another man in the kitchen. *United States* v. *Beverly*, supra, 750 F.2d 35. Between the two men was a waste basket containing two guns, one of which had the defendant's fingerprint on it. Id. The court determined that this evidence was insufficient to support a finding of constructive possession, stating that the evidence "establishes only that [the defendant] was in the kitchen of [the third party's] residence, that [the defendant] was standing close to a waste basket [that] contained two guns, and that [the defendant] had at some point touched one of the guns,'' which fell short of establishing constructive possession. Id., 37.

State *v.* Dawson

Court properly distinguished *Beverly* from the present case because *Beverly* is a " 'proximity-only' "[16] case, and "the defendant's conviction [in the present case] does not rest on DNA evidence alone . . . ."

We disagree. Indeed, in our view, the evidence in the present case is considerably *weaker* than that which was found insufficient to support the defendant's conviction in *Beverly*. Notably, the defendant here was in a public place, whereas the defendant in *Beverly* was in a private residence (albeit not his own). Moreover, the defendant here was four to five feet from the gun, with others sitting closer, whereas the defendant in *Beverly* was within arm's reach of the gun and one of only two people in the room. Finally, in the present case, only trace amounts of DNA from which the defendant's DNA profile could not be excluded was found on the gun, and it could not be established that he actually touched the gun, whereas the defendant in *Beverly* left a definitive latent fingerprint on the gun in question.

Moreover, we are not persuaded by the Appellate Court's conclusion that *United States* v. *Lynch*, 459 Fed. Appx. 147 (3d Cir. 2012),[17] an unreported decision

---

[16] The state, in arguing that *Beverly* is distinguishable, relies primarily on the fact that *Beverly* was later limited by the Sixth Circuit in *United States* v. *Vichitvongsa*, 819 F.3d 260, 276 (6th Cir.), cert. denied,　　U.S.　　, 137 S. Ct. 79, 196 L. Ed. 2d 70 (2016), in which the court clarified that *Beverly* is "a proximity-only case without any evidence connect[ing] the gun to the defendant," and, thus, *Beverly* is inapposite when the government fills the evidentiary gap by connecting the gun to the defendant. (Internal quotation marks omitted.) Id.

[17] In *Lynch*, police officers recovered a pistol during a permissible warrantless search of the defendant's home. *United States* v. *Lynch*, supra, 459 Fed. Appx. 149. Subsequent forensic testing revealed a mixture of DNA on the pistol from which the defendant's profile could not be excluded. Id. After the defendant argued, citing *Beverly*, that there was insufficient evidence to support his conviction of possession of a firearm and ammunition, the Third Circuit held that, although *Beverly* "might mitigate the importance of the DNA evidence, it does little to change our view of the other evidence tending to show that [the defendant] constructively possessed the firearm . . . ." Id., 151.

State *v.* Dawson

by the United States Court of Appeals for the Third Circuit, is analogous to the present case. Rather, we find *Lynch* readily distinguishable because, in addition to evidence of the defendant's DNA on the gun, there was evidence in *Lynch* that the gun and ammunition were found *in the defendant's own home*, specifically concealed under his clothing in a dresser drawer in his bedroom. Id., 151–52. There is no such comparable evidence in the present case.

In sum, we are unpersuaded that, even taking the cumulative force of all the evidence together and construing it in the light most favorable to sustaining the verdict, it establishes anything more than a temporal and spatial nexus between the defendant and the gun found in a public area. See *State* v. *Rhodes*, supra, 335 Conn. 241. Therefore, we conclude that the evidence was insufficient to establish beyond a reasonable doubt that the defendant had knowledge of the gun and the intent to exercise dominion or control over it.

The judgment of the Appellate Court is reversed in part and the case is remanded to that court with direction to reverse the judgment of the trial court as to the conviction of criminal possession of a pistol or revolver and to remand the case to that court with direction to render judgment of acquittal on that charge; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion McDONALD, D'AURIA, KAHN and ECKER, Js., concurred.

ROBINSON, C. J., dissenting. I respectfully disagree with the majority's conclusion that insufficient evidence existed to support the conviction of the defendant, Andre Dawson, for criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a). I believe that the majority's painstaking dissection of

State *v.* Dawson

the jury verdict in this case is wholly inconsistent with the analysis in our very recent decision in *State* v. *Rhodes*, 335 Conn. 226, 249 A.3d 683 (2020), which emphasized in no uncertain terms that, in cases concerning constructive possession, this court does not sit as a "seventh juror"; (internal quotation marks omitted) id., 251; given our obligation to "construe the evidence in the light most favorable to sustaining the verdict and then determine whether, on the basis of those facts and the inferences reasonably drawn from them, the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) Id., 229. Because I would affirm the well reasoned opinion of the Appellate Court, which is consistent with these cardinal principles of appellate review; see *State* v. *Dawson*, 188 Conn. App. 532, 205 A.3d 662 (2019); I respectfully dissent.

The majority's opinion is wholly inconsistent with our recent emphasis in *Rhodes* of "the deference we must afford to the jury and the practical problems of proof in the nonexclusive possession context: [W]e would adhere to that concept in preference to artificial rules restricting evidence-sufficiency rules that would inevitably invade the traditional province of the jury . . . . The judge's task intensifies . . . when the accused's relationship to the premises is shared with others, and consequently the problems of knowledge and control intensify. . . . [I]n full recognition of the increased difficulties that the [g]overnment then faces, we reiterate that the sufficiency of the evidence for jury consideration depends [on] its capability plausibly to

State *v.* Dawson

suggest the likelihood that in some discernible fashion the accused had a *substantial voice vis-à-vis* the [contraband].'' (Emphasis in original; internal quotation marks omitted.) *State* v. *Rhodes*, supra, 335 Conn. 236– 37, quoting *United States* v. *Staten*, 581 F.2d 878, 884 (D.C. Cir. 1978).

As we recognized in *Rhodes*, a ''case for constructive possession of a firearm often is necessarily built on inferences, and a jury may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . A jury also may draw factual inferences on the basis of already inferred facts.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Rhodes*, supra, 335 Conn. 237– 38. As in *Rhodes*, my ''review of the evidence finds several circumstances tending to buttress . . . an inference . . . that the defendant had the knowledge of and intent to control the firearm that our law requires for a finding of constructive possession, including facts and inferences that reasonably permitted the jury to conclude that, in all probability, [he] had the ability to go and get the gun.'' (Citation omitted; internal quotation marks omitted.) Id., 238–39. In my view, the touch DNA evidence found on the gun, coupled with the defendant's proximity to it and the testimony of a Norwalk police officer, Kyle Lipeika, that (1) it is a common practice for individuals to discard weapons when they believe that police officers are approaching, and (2) the gun appeared to have been freshly placed in the courtyard planter because it was clean, with a surface that lacked rust or dust, provided sufficient circumstantial evidence of constructive possession to support the defendant's conviction.

The majority, however, engages in a detailed analysis discounting this evidence and concluding that ''there were simply too many unknowns for the jury to find beyond a reasonable doubt that the defendant had even

State *v.* Dawson

touched the gun, much less that he was aware of its presence near where he was seated on the night in question and intended to exercise dominion or control over it.'' These aspects of the majority's opinion, which (1) discount the weight of the touch DNA evidence, (2) highlight the defendant's cooperation and lack of flight or incriminating statements, and (3) observe that the individuals who accompanied the defendant sat slightly closer to the planter, provide a well reasoned closing argument for the defense, but ultimately are inconsistent with our long settled approach to appellate review of sufficiency of the evidence issues.

Beyond these observations, ''[o]rdinarily, I would write a comprehensive dissenting opinion with a thorough discussion of the applicable law and a detailed review of the record. The Appellate Court has, however, issued a comprehensive and well reasoned opinion, authored by Judge [Lavine], which provides a full explication of the . . . record and governing legal principles in this case. . . . In the interest of aiding in the discharge of this court's institutional obligation to provide timely decisions to litigants and the public, I adopt Judge [Lavine's] excellent opinion as a complete statement of my reasoning for respectfully dissenting from the judgment of this court.'' (Citation omitted.) *Dept. of Transportation* v. *White Oak Corp.*, 319 Conn. 582, 622, 125 A.3d 988 (2015) (*Robinson, J.*, dissenting); see, e.g., *Brenmor Properties, LLC* v. *Planning & Zoning Commission*, 326 Conn. 55, 62, 161 A.3d 545 (2017).

Because I would affirm the judgment of the Appellate Court, I respectfully dissent.